Frank A. Garlove and Laverne C. Garlove v. Commissioner.
Garlove v. Commissioner
Docket No. 4173-62.
United States Tax Court
T.C. Memo 1965-201; 1965 Tax Ct. Memo LEXIS 129; 24 T.C.M. (CCH) 1049; T.C.M. (RIA) 65201; July 23, 1965
*129 Petitioner, a practicing lawyer, made loans to client K corporation, in which he was a minority shareholder. The loans (which became worthless in 1958) were made to help K meet competition and finance its inventory so that it could continue as one of petitioner's fee paying clients. This client had paid the petitioner substantial legal fees for several years, and additional fees earned by petitioner from individual shareholders of K corporation were directly attributable to petitioner's association with them therein. Held, that under such circumstances the loans to K corporation were proximately related to petitioner's law practice, and the loss from their worthlessness is deductible as a business bad debt. Cf. Stuart Bart, 21 T.C. 880 (1954). Irwin G. Waterman, Marion E. Taylor Bldg., Louisville, Ky., for the petitioners. S. Earl Heilman, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined a deficiency in the petitioners' Federal income tax for 1953 in the amount of $3,647.47. The deficiency arises from respondent's disallowance of a deduction of $9,500 as a business bad debt for 1958. The amount in question represents the unpaid balance of loans made by the petitioner, Frank A. Garlove, (hereinafter referred to as the petitioner or Garlove) to a corporation which went into receivership in 1958. The sole issue for our consideration is whether loans made by the petitioner, a practicing attorney, to a fabric manufacturing corporation were made "in connection with a trade or business of the taxpayer." Another issue raised by the pleadings and concerning 1959 was conceded by petitioner and the resulting deficiency will be computed under Rule 50. Findings of Fact Some of the facts have been stipulated and are incorporated *131 herein by this reference. The petitioners, Frank A. Garlove and Laverne C. Garlove, are husband and wife and reside at 27 River Hill Road, Louisville, Kentucky. They filed their joint Federal income tax return for 1958 with the district director of internal revenue at Louisville, Kentucky. Laverne C. Garlove is a party to this proceeding only because she signed the joint return for 1958; consequently, Frank A. Garlove is referred to herein as petitioner. The petitioner is a lawyer and has practiced law continuously since June of 1928 in Louisville, Kentucky. From 1928 to 1938 he practiced in the law office of the late Charles W. Morris (hereinafter referred to as Morris). From sometime in 1938 to the end of 1961 the petitioner was a member of the law firm of Morris & Garlove. The firm was dissolved in December of 1961 by the death of Morris. From 1962 to the time of the trial the petitioner was the senior member of the law firm of Morris, Garlove, Waterman and Johnson. The petitioner started his career in law by defending insurance companies. Since 1938 when Morris took him in as a partner, the petitioner has confined his practice to tax law, real estate law, estate work, and *132 general business law. The petitioner characterized the partnership of Morris & Garlove as a hybrid arrangement. Some of the legal business handled by the petitioner and Morris was considered partnership business, and the two men divided equally the distributable net profits from this business. In addition the petitioner and Morris had various personal clients, and the fees from these clients did not pass through the partnership but belonged entirely to the man who did the work. The petitioner received income from the partnership of Morris & Garlove in the following amounts from 1947 through 1959: 1947
$25,426.89
1948
19,399.96
1949
23,157.61
1950
26,194.77
1951
22,102.75
1952
19,267.26
1953
28,048.34
1954
$27,861.96
1955
27,205.01
1956
24,751.07
1957
23,341.28
1958
26,406.17
1959
25,385.98
Kentucky Looms, Inc., a relatively small, closely held company, was incorporated in Kentucky in 1940. Petitioner was a stockholder and director of this company from the time of its organization until it ceased to do business in 1958. Kentucky Looms was in the textile business. The company manufactured ladies' scarves, couch throws and other items made *133 of woolen fabrics. Another important line of business was clothing for children. The petitioner was a minority stockholder in Kentucky Looms. He bought common stock in the company with a par value of $10 per share in the following amounts on the dates indicated: Date
Number of Shares
2/21/40
3
2/ 7/41
100
2/ 7/41
100
2/ 7/41
100
2/ 7/41
50
2/ 7/41
147
2/14/41
4
8/10/54
552 3/4 At no time did the petitioner own more than 25 percent of the total common stock of Kentucky Looms. When the company went out of business in 1958, there were 25 or 30 stockholders. The petitioner's stock in Kentucky Looms cost him $7,040. On March 4, 1953, the petitioner and his esteemed friend and business associate, Joseph G. Huter (hereinafter referred to as Huter) made a loan of $15,000 to Kentucky Looms. The company used this money to pay off its debt in a like amount to the Citizens Fidelity Bank and Trust Company (hereinafter referred to as Citizens Fidelity). On March 4, 1953, Kentucky Looms gave the petitioner and Huter a note to their joint order for $15,000, bearing interest at the rate of 4 1/2 percent per annum, payable 9 months after date. On the same day Huter *134 and the petitioner gave Citizens Fidelity their joint note for $15,000, bearing interest at the rate of 4 percent per year. Kentucky Looms needed money in March of 1953 because during that month it moved its manufacturing plant from an old four-story building into a one-floor location, and at the same time the company switched from hand looms to power looms. The cost of these changes was $16,863.52. During June of 1953, Citizens Fidelity raised the interest rate on its loan to the petitioner and Huter from 4 percent to 4 1/2 percent per annum. On August 24, 1953, the two men paid off this loan at Citizens Fidelity with money drawn from their joint account with Stein Bros. & Boyce, an investment firm. Early in 1957 Aaron Karl (hereinafter referred to as Karl), a stockholder in Kentucky Looms, told the petitioner that the company needed money to finance its inventory. Karl suggested that he and Garlove furnish the money because Kentucky Looms was already heavily indebted to Citizens Fidelity. On May 13, 1957, the petitioner and Karl made a loan of $15,000 to Kentucky Looms. The company gave the petitioner and Karl a note to their joint order for $15,000. This note provided for *135 interest at the rate of 6 percent per year. Kentucky Looms needed this loan because of the seasonal nature of its business. The company manufactured and designed its product line early in the summer. The inventory was built up for shipping in August, September, October, and November. The need for financial assistance in 1957 was particularly acute because Kentucky Looms was trying to expand its sales, and this meant speculating on more finished inventory. At the time of the loan in May of 1957, Kentucky Looms had a surplus, and the petitioner expected the company to continue doing business. Kentucky Looms went into receivership in 1958. The failure of the company was caused by the unexpected and unforeseeable decision of its largest customer, a west coast concern, to change from Kentucky Looms merchandise to Japanese merchandise leaving Kentucky Looms with a large amount of unsold inventory. When Kentucky Looms went out of business in 1958, it owed the petitioner and Karl a balance of $4,000 on the note for $15,000. The petitioner's proportionate share of the loss on this note was $2,000. Kentucky Looms had made no payments on the $15,000 note to Huter and the petitioner. The *136 petitioner's oustanding loans to Kentucky Looms in the amount of $9,500 became worthless in 1958. In addition to his income from his law partnership, Morris & Garlove, the petitioner received legal fees from various personal clients. The petitioner developed these personal clients by investing in various closely held local companies in the Louisville area. The most important of such clients were the Riggs Motor Co., Inc. (hereinafter referred to as Riggs Motor), Mail Photo Service, Inc. (hereinafter referred to as Mail Photo), and Kentucky Looms. These three companies became a very important source of legal work to him. Riggs Motor paid the petitioner legal fees totaling $36,965 from 1948 through 1958. Between 1944 and 1959 the petitioner earned fees from Mail Photo amounting to $27,650. And during a comparable period Kentucky Looms paid the petitioner legal fees totaling $10,081.37. In fact in the ten-year period from 1948 to 1958 the legal fees earned from these three companies amounted to about 25 percent of the petitioner's total income from his law practice. In investing in these companies the petitioner's primary and dominant motive was to increase his law practice. The *137 hope of capital gains was subsidiary to this. In none of these companies did the petitioner own more than 25 percent of the stock, and there was no ready market for these minority interests. None of the companies ever paid a dividend. By investing in these companies the petitioner hoped to improve his law practice in two ways: first by creating a paying client out of the particular company, and second by maintaining and in some cases establishing a client relationship with the business men who were also investors in these companies. The individual shareholders of Mail Photo are important clients of the petitioner. At the time of the trial the other four shareholders were Samuel Switow, Harry Switow, and Fred Switow, three brothers, and Lewis Cole; all of them are clients of the petitioner. The petitioner settled the estate of Lewis Cole's father, which estate had assets of nearly a million dollars. Some of the individual stockholders of Kentucky Looms were also clients of the petitioner. Herman Ullman, a full-time employee of Kentucky Looms, was a stockholder, and the petitioner handled the estates of both Ullman and his wife. When Ullman died, Karl became a stockholder in Kentucky *138 Looms, and he became a client of the petitioner. Huter was a director and one of the original incorporators of Kentucky Looms, and he was one of petitioner's most important clients, being directly responsible for two $25,000 fees earned by the petitioner, one in connection with the sale of Fairfield Distillery to McKesson Robbins Company in 1942 and the other in connection with the dissolution of the Bessire Company. When Huter died in 1962, the petitioner handled his estate which has paid petitioner's fees of $5,000 in 1962 and $2,500 in 1963. Both Ullman and Huter were clients of the petitioner before the incorporation of Kentucky Looms, but the petitioner's association with them in the affairs of Kentucky Looms over a period of many years was the decisive factor in winning for him their estate work. Opinion The petitioners claimed a deduction on their joint Federal income tax return for 1958 of $9,500 as a loss on a business bad debt. The respondent denied this deduction stating in his deficiency notice that "the loss of $9,500 sustained by you in 1958 as a result of the failure of Kentucky Looms, Inc., constitutes a nonbusiness bad debt." The parties agree that the debt *139 in question became worthless in 1958. The dispute is whether the loss from the worthlessness of this debt is deductible in full as a business bad debt or deductible only as a short-term capital loss under section 166(d)(1)(B) as a nonbusiness bad debt. The deductibility of this loss is governed by section 166 of the Internal Revenue Code of 1954 which provides in pertinent part as follows: SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satistied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom *140 shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Deciding when a loan is "created * * * in connection with a trade or business of the taxpayer" has proved to be a difficult question for the courts. A successful verbal formula to cover any given case has never been developed. The applicable cases emphasize that whether a debt is incurred in a taxpayer's trade or business is a question of fact to be determined from all the circumstances. J. T. Dorminey, 26 T.C. 940 (1956); S. E. Maitland Brenhouse, 37 T.C. 326 (1961); United States v. Keeler, 308 F. 2d 424 (C.A. 9, 1962). It is agreed that the petitioner is not in the business of loaning *141 money or of promoting, financing and managing business enterprises. The petitioner's only business is the practice of law, and his sole argument is that the loans in question were essential to, or so proximately related to his law practice that they could be said to have been made in connection with his practice. The respondent concedes that if the loans bear a sufficiently direct relationship to the petitioner's law practice, they may qualify as business debts, even though Garlove's business is not that of loaning money or promoting business enterprises. But the respondent argues that a sufficiently direct, proximate relationship between the petitioner's loans to Kentucky Looms and his law practice is not shown by the evidence to qualify these loans as business debts of the petitioner. Deciding if a loan is directly or proximately related to a taxpayer's law practice is in some respects more complicated than determining if a loan is proximately related to an individual's commercial business. The sources of supply, production processes, and sales outlets of a commercial enterprise are normally easy to identify. When such an enterprise is well established and its activities routine, *142 it is usually easy to decide when a loan is directly or proximately related thereto. The instant case is more difficult. It is almost impossible to define the limits of a typical law practice. In its simplest form the practice of law involves the obtaining of legal work from organizations and individuals. There is no sure or easy way to develop clients or find legal work. Law suits and legal work cannot be bought and sold in the market place. Furthermore, a lawyer cannot lend money to an existing client with any assurance that this loan will necessarily result in legal work for him. Thus any loan, even to a client, has to be made only in the hope and expectation of future legal business. Garlove did not have the benefit of lucrative retainers from large corporations. Like the great majority of lawyers his practice depended importantly upon reputation and referrals and a wide range of personal friendships. The petitioner's testimony showed that his sources of business were highly unpredictable. Partly because of this aspect of his practice and partly because clients can be capricious, the petitioner was interested in assuring himself a regular and dependable flow of fees. He thought *143 that any client in which he had a proprietary interest would remain his without the normal problems incident to the creation and maintenance of a client relationship. This opinion proved to be accurate. The petitioner owned minority interests in Mail Photo, Riggs Motor, and Kentucky Looms. During the entire life of these companies he was able to keep them as clients, and they were a very important source of fees to him. From 1948 to 1958 the fees from those companies averaged about 25 percent of petitioner's total income from his law practice. The petitioner testified that his primary motive in investing in Kentucky Looms and the other companies which paid him legal fees was to develop and expand his law practice. We think the record supports this testimony. None of the companies in which the petitioner owned stock ever paid him a dividend. The petitioner was an officer and director of Kentucky Looms, but he never received any compensation for his executive duties. Stuart Bart, 21 T.C. 880 (1954); J. T. Dorminey, supra.There was no ready market for his minority interest in Kentucky Looms. In the 18-year history of that company the petitioner never *144 sold any of its stock. The record also shows that the petitioner had investments in various speculative partnerships which paid him investment income. The petitioner testified that his purpose in loaning money to Kentucky Looms was to support a regular, paying client and not to protect the value of his capital investment. We deem this testimony reasonable and worthy of belief. Respondent's contention that the petitioner advanced $15,000 to protect a capital investment of $7,040 in a small company is unsupported by the record [1] and unsound in theory. The mere fact of stock ownership in the debtor corporation is not sufficient by itself to overcome the weight of petitioner's evidence that the primary purpose of the loan was to aid petitioner's business. J. T. Dorminey, supra; Wilfred J. Funk, 35 T.C. 42 (1960); Tony Martin, 25 T.C. 94 (1955); R. B. Cowden, 34 T.C. 819, 826 (1960). The purpose of the loans *145 was to help Kentucky Looms meet operating expenses so the company could continue as a client. The loan of March 4, 1953, was made to help the company change its manufacturing location, and the loan of May 13, 1957, was necessary to finance an expansion of inventory. The first loan was made with Huter, who was a very important client of the petitioner, and the second one was made at the direct suggestion of Karl, another client. We think the loans made to Kentucky Looms were directly related to the petitioner's law practice. The petitioner's practice depended importantly upon personal friendships and referrals. Like most lawyers he did not have the advantage of large retainers assuring him of a certain amount of income for any given year. By investing in Kentucky Looms he developed and retained personal clients, and he did not have to share fees from these clients with his partner, Morris. Private individuals were also important to the petitioner's practice. Ullman and Huter were stockholders in Kentucky Looms, and they were clients of the petitioner. Garlove handled the estates of both men, and this work resulted from his long and close association with them in the affairs of Kentucky *146 Looms. Since Kentucky Looms was one of the petitioner's few regular clients, we think the loans to it were incurred in connection with his business. When petitioner made these loans, as a member of the legal profession he could not be sure that any given amount of legal work would follow. By helping the company to continue its operations as profitably as possible, the petitioner hoped to get future business. In the past Kentucky Looms had been an important client. Events proved Garlove to be too optimistic because Kentucky Looms went out of business unexpectedly in 1958. Nevertheless, his original expectations were realistic. Cf. S. E. Maitland Brenhouse, supra. Of the cases cited by the petitioner, Stuart Bart, supra, is most similar to the instant case. The taxpayer was an advertising agent. He was employed by a client in connection with the publication of its magazine. Because of this client relationship the taxpayer obtained other clients, some of whom advertised in this magazine. The taxpayer loaned money to the client to enable it to pay operating expenses. When this loan became worthless, the loss was held to be deductible as a business bad *147 debt. The debt was found to be proximately related to his business because he advanced the money in an effort "to retain the client on a profitable basis, to hold other clients advertising in the publication of this one, and to maintain his credit standing and reputation as an advertising agent." The rationale fits the instant case. The cases cited by the respondent are distinguishable. In Putnam v. Commissioner, 224 F. 2d 947 (C.A. 8, 1955), affirming a Memorandum Opinion of this Court, affirmed on another issue 352 U.S. 82, the taxpayer was a lawyer who loaned money to a corporation which was not a client and which never paid him a fee. In Robert H. McNeill, 27 T.C. 899 (1957), reversed on other grounds 251 F. 2d 863 (C.A. 4, 1958), certiorari denied 358 U.S. 825 (1958), the taxpayer was a lawyer who made loans to persons described by him as clients, but he did not show any fees earned from these "clients." The loss from the worthlessness of the loans was held to be a nonbusiness bad debt because the taxpayer's purpose in making the loans and his relationship with the debtors were "meagerly" described at the *148 hearing. In Estate of Dominick F. Pachella, 37 T.C. 347 (1961), three law partners were the sole shareholders in a large dry cleaning company. Loans to this company became worthless. There was no proof of any fees earned or even expected to be earned from this company. The respondent's reliance on Gulledge v. Commissioner, 249 F. 2d 225 (C.A. 4, 1957), certiorari denied 356 U.S. 959 (1958) is misplaced. In Gulledge the court decided that planting and processing peanuts were separate and distinct businesses. Because of petitioner's concession, Decision will be entered under Rule 50. Footnotes
1. At the time of petitioner's first loan on March 4, 1953, he had only 504 of the 1056 3/4 shares which he eventually owned.↩