ODDEE SMITH AND MABLE B. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3342-69.    Filed November 3, 1970.

*Lauch M. Magruder, Jr.,* and *Charles L. Brocato,* for the petitioners.
*Robert G. Faircloth,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1965 and 1966 in the amounts of $43,420.24 and $30,026.03, respectively.

Because of concessions by the parties the only issue presented for our decision is whether certain advances made by petitioner to Smith Petroleum Service, Inc., are deductible as business bad debts, as nonbusiness bad debts, or as ordinary and necessary business expenses. The amounts involved are $78,981.35 for the year 1965 and $6,844.32 for the year 1966.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Petitioners are husband and wife and resided in Brookhaven, Miss., at the time they filed their petition herein. They filed their joint Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Jackson, Miss.

Petitioner Oddee Smith (hereinafter referred to as petitioner) has been engaged in the construction business since 1948, operating as a sole proprietorship under the name Smith Gravel Service (hereinafter referred to as Smith Gravel). The type of work performed by Smith Gravel consisted primarily of grading, road construction, and maintenance work.

Prior to 1958, petitioner's gross income from Smith Gravel was less than $20,000 per year, all of which was derived from private contract work. However, in 1958 the gross income of Smith Gravel rose to $381,446.29, of which 96 percent or $369,865 represented income from grading and road-building work in oilfields in the Brookhaven, Miss., area. Beginning in about 1960 Smith Gravel also became engaged in public roads construction work and its gross income rose substantially to a high of $1,363,125.52 in 1968; the percentage of gross profit received from work performed at oil well sites declined, however, to a low of 9 percent in 1968. The following table sets forth the gross income of Smith Gravel for each of the years 1958 through 1968 with the amount of income in each year from work performed in oilfields:

| Year | Gross income | Income from oilfield work | Percentage |
|---|---|---|---|
| 1958 | $381,446.29 | $369,865.00 | 96.916 |
| 1959 | 621,403.97 | 582,554.42 | 93.748 |
| 1960 | 510,249.80 | 439,059.46 | 86.047 |
| 1961 | 548,735.79 | 320,650.88 | 58.434 |
| 1962 | 682,043.76 | 231,272.40 | 33.908 |
| 1963 | 1,028,059.00 | 294,716.29 | 28.807 |
| 1964 | 741,621.71 | 166,816.14 | 22.493 |
| 1965 | 972,034.66 | 147,677.89 | 15.192 |
| 1966 | 939,167.46 | 152,398.40 | 16.226 |
| 1967 | 1,034,354.34 | 133,400.46 | 12.896 |
| 1968 | 1,363,125.52 | 127,143.95 | 9.327 |

The decrease in the percentage of gross income received from work performed in oilfields was attributable to the fact that demand for grading and roadbuilding work in the oilfields decreased and also to the fact that Smith Gravel, beginning in 1960, commenced doing State aid and State highway projects, generally referred to as public road projects.

In February 1960 petitioner and James L. Francis (hereinafter referred to as Francis) entered into a partnership to engage in the oil well servicing business. The partnership was subsequently incorporated on January 1, 1961, under the name General Oil Well Service, Inc. On February 23, 1961, the corporation's name was changed to Smith Petroleum Service, Inc. (hereinafter referred to as Smith Petroleum). Petitioner invested $20,000 in the business when it was formed.

The total authorized capital of Smith Petroleum was $20,000 represented by 200 shares of common stock of $100 par value. Petitioner and Francis each held 100 shares of stock of Smith Petroleum.

Petitioner entered into the oil well servicing business after Francis persuaded him that a profit could be made. Petitioner felt that the oil well servicing business would fit in with the work performed by Smith Gravel in the oilfields since the work was performed for many of the same people Smith Gravel did construction work for in the oilfields. Because of the contacts and prior dealings with potential customers of the oil well servicing business through Smith Gravel, petitioner was convinced the oil well servicing business would be profitable. The road-building business and the oil well servicing business, however, were altogether different types of businesses.

Petitioner did not have any experience in the oil well servicing business. He served as general manager and as president after the business was incorporated. Petitioner furnished the credit, bought the necessary equipment, and handled the administrative affairs of Smith Petroleum. He received no compensation for his services. On the other hand, Francis was experienced in the oil well servicing business and therefore served as field supervisor. Francis received compensation for his services.

In its first short year of operation ending December 31, 1960, Smith Petroleum realized a loss of $6,886.02. However, in 1961 Smith Petroleum realized a loss of only $522.01 and in 1962 realized a profit of $6,201.69. Petitioner and Francis were pleased with the success of the operation at that time and in April 1963 decided to purchase a Cardwell Model KM200–A single-drum Travelrig and accessories at a cost of $120,070.76. The cost of this equipment, together with a finance charge of $30,152.34, was financed through C.I.T. Corp., the debt being

evidenced by a promissory note given by Smith Petroleum and secured by a chattel mortgage on the equipment purchased.

After having realized a gain from operations in 1962, Smith Petroleum realized a loss from operations each year thereafter. The gross receipts and net profits or losses of Smith Petroleum from its inception were as follows:

| Year | Gross receipts | Net profit (loss) |
|------|---------------|-------------------|
| 1961 | $157, 330. 70 | ($522. 01) |
| 1962 | 149, 404. 82 | 6, 201. 69 |
| 1963 | 175, 854. 95 | (7, 737. 75) |
| 1964 | 148, 952. 71 | (28, 714. 96) |
| 1965 | 142, 973. 89 | (72, 587. 96) |
| January 1966 | 956. 34 | (32, 765. 81) |

Beginning in the latter part of 1963, Smith Petroleum was unable to meet all of its current operating expenses or all of the payments becoming due on its notes payable. As a result, beginning in 1963 and continuing through January 1966, petitioner caused his sole proprietorship, Smith Gravel, to advance funds to Smith Petroleum and also to make various payments directly in behalf of Smith Petroleum. In addition, during the period from January 1963 through January 1966, invoices were sent to Smith Petroleum by Smith Gravel for various items for which no payment was ever received. The advances made in 1963, 1964, and 1965 totaled $84,221.39, while the total of advances made in January 1966 was $6,843.44.

On August 21, 1965, Smith Petroleum redeemed the 100 shares of its common stock owned by Francis, leaving petitioner as the sole stockholder. On October 15, 1965, Smith Petroleum refinanced the balance due on its promissory note to C.I.T. Corp. for the Cardwell travelrig. The purpose of the refinancing was to reduce the amount of the monthly payments so that the payments could possibly be met as they became due.

On December 30, 1965, the business activities of Smith Petroleum were terminated. At that time, Smith Petroleum owned assets having a total book value less accumulated depreciation of $125,742.15, consisting of accounts receivable, prepaid interest, and various pieces of machinery and equipment. The total liabilities and capital stock of Smith Petroleum on that date amounted to $229,203.17. The significant items comprising that amount were:

| | |
|---|---|
| Notes payable on machinery | $95, 235. 49 |
| Notes payable to Brookhaven Bank & Trust Co | 16, 000. 00 |
| Sums due Smith Gravel Service | 95, 416. 72 |
| Capital stock | 20, 000. 00 |

On March 23, 1966, the machinery and equipment were reconveyed to the manufacturer in satisfaction of the notes due thereon and the

chattel mortgage covering such equipment was released. All other assets of Smith Petroleum were sold or otherwise disposed of with the proceeds of any such sale being applied on the indebtedness of Smith Petroleum. The notes payable to Brookhaven Bank & Trust Co., having been guaranteed by petitioner, were not satisfied but were assumed by petitioner. No portion of the sums due Smith Gravel were ever repaid.

In 1963, when petitioner began making advances to Smith Petroleum, a substantial portion of Smith Gravel's gross receipts was derived from public road projects. In order to submit a bid on any public road project, petitioner was required to submit a surety bond (bid bond) equal to 5 percent of the amount of the bid. Furthermore, if petitioner was the low bidder he could not be awarded the contract unless he submitted a second surety bond (performance bond) equal in amount to the contract price. If petitioner was unable to post the necessary surety bonds, he could not be awarded the contract.

Starting in 1963, petitioner purchased all of his surety bonds from Employer's Mutual Insurance Co. (hereinafter referred to as Employer's). In determining whether to furnish a contractor a surety bond and the amount of the bond it will furnish, Employer's carefully considers the contractor's character, his experience, the amount of financial resources available to him, the distribution of his debt as to short- or long-term liabilities, his operating capital, and the percentage of his operating capital in relation to his total workload. In addition, Employer's considers the contractor's credit standing and reputation and considers this factor to be of vital importance.

Employer's maintains a continuing review of each client's account. This is done generally by subscribing to a mercantile reporting service which provides two principal reports a year on credit ratings of various people, together with special reports which provide information on such events as a chattel mortgage being placed on equipment, a lien being filed, a judgment being filed, or anything that occurs which is not routine in nature. Furthermore, in petitioner's case, Employer's required a monthly progress report on all bonded and unbonded work and audited financial statements twice a year. Employer's also received quarterly reports from the people who owned the jobs, the State Highway Department in petitioner's case. Furthermore, Employer's required petitioner to furnish financial statements from Smith Petroleum.

Because of the financial statements received from Smith Petroleum, Employer's was aware of petitioner's interest and personal involvement in Smith Petroleum and considered this factor in its evaluation and review of petitioner's account. Employer's was also aware that

Smith Petroleum was losing money and that petitioner was making advances to Smith Petroleum.

When Smith Petroleum was formed, petitioner thought it was adequately capitalized and did not anticipate that it would be necessary for him to advance funds to Smith Petroleum in the future. The advances to Smith Petroleum from petitioner went to satisfy either current operating expenses of Smith Petroleum or current payments due on its notes and accounts payable. Petitioner's policy in his business affairs was to pay his accounts payable within 30 days; however, some bills of Smith Petroleum were not paid until 90 days after the billing date.

The local agent of Employer's had advised petitioner that a poor credit rating of Smith Petroleum would reflect on his personal credit rating with the result that it could lead to a reconsideration of his bonding capacity, either a reduction in the amount of the bond Employer's would furnish or perhaps even in Employer's refusal to furnish additional bonds for petitioner. Also, the bond department manager of Employer's had impressed upon petitioner the necessity of maintaining a good credit rating and credit reputation.

During the time that Smith Petroleum was having financial troubles and petitioner was making advances to Smith Petroleum, petitioner was very much concerned about his credit rating, particularly in regard to his capacity to secure the necessary surety bonding for Smith Gravel. It was his hope that by advancing the funds to Smith Petroleum he could keep it going until such time as he could dispose of it.

Having realized in 1963 that Smith Petroleum might not be successful, petitioner attempted unsuccessfully on two occasions in 1964 to sell Smith Petroleum. After his efforts to sell his interest in Smith Petroleum were unsuccessful, petitioner then caused Smith Petroleum to attempt to sell its equipment, which effort was also unsuccessful. Petitioner could have caused Smith Petroleum to cease operations prior to 1965 in order to prevent any further losses and to keep from having to advance further funds to Smith Petroleum. However, if petitioner had caused Smith Petroleum to cease operations earlier than 1965, in addition to losing his investment, any equipment under finance would have been repossessed. Petitioner continued to advance funds to Smith Petroleum because, in part at least, of his fear that a repossession of its equipment or the failure of Smith Petroleum to meet its obligations would adversely affect his credit rating and thereby endanger his bonding capacity.

Even though petitioner felt that by advancing funds to Smith Petroleum he was protecting his credit reputation for bonding purposes, the advances had the effect of reducing petitioner's working capital, a factor also considered by Employer's in deciding whether to issue

a surety bond. However, petitioner was able to maintain an adequate working capital and net worth position which was sufficient for the necessary bonding of work on hand and also work planned in the future of Smith Gravel. In fact, petitioner has never been turned down for a surety bond, even though he has had some close calls due mainly to the size of the contract.

During the period involved herein, petitioner maintained a good credit rating. Employer's has furnished all of the bonds required by petitioner in his road construction business with the amount of the bonds increasing over the period involved herein.

On his 1965 and 1966 Federal income tax returns petitioner claimed a deduction for business bad debts in the respective amounts of $91,421.87 and $12,637.20, of which the respective amounts of $84,221.39 and $6,844.32 [1] represent advancements made to Smith Petroleum. Respondent disallowed the deduction of these advances to Smith Petroleum as business bad debts to the extent of $78,981.35 and $6,844.32, respectively, but did allow them as nonbusiness bad debts.

Petitioner was not in the business of lending money or of promoting, financing, and managing enterprises. The parties are in agreement that the amounts here involved were debts owing by Smith Petroleum to petitioner, and we so find. In making the loans to Smith Petroleum petitioner was significantly motivated by a desire to protect his credit rating which was needed for his road construction business.

OPINION

Petitioner contends that his advances of $78,981.35 and $6,844.32 to Smith Petroleum constitute business bad debts and are therefore deductible in full under section 166(a)(1), I.R.C. 1954,[2] or in the alternative that the advances constitute ordinary and necessary business expenses, deductible in full under section 162(a).[3]

---

[1] There is a discrepancy between this amount and the amount of $6,843.44 which we stated earlier in our Findings of Fact to be the amount of advances petitioner made to Smith Petroleum in 1966. While both amounts were stipulated to by the parties, the amount of $6,844.32 was the amount disallowed by respondent in the statutory notice of deficiency. Since the amount of $6,844.32 was the amount upon which the asserted deficiency was computed for 1966, we must use that amount for the purposes of our decision. The amount advanced by petitioner to Smith Petroleum in 1966 after the latter ceased doing business was to enable Smith Petroleum to pay off all of its third-party creditors.

[2] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954, as amended.

SEC. 166. BAD DEBTS.
    (a) GENERAL RULE.—
        (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

[3] SEC. 162. TRADE OR BUSINESS EXPENSES.
    (a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

Respondent does not contest the characterization of the advances as debt (rather than contributions to capital); nor does he contest the worthlessness of the debts of $78,981.35 and $6,844.32 in 1965 and 1966, respectively. Respondent's contention is simply that the advances constitute nonbusiness bad debts within the meaning of section 166(d) [4] and consequently are deductible under that section as short-term capital losses.

Initially, we dispose of petitioner's alternative contention that the advances represented ordinary and necessary business expenses of his sole proprietorship, Smith Gravel, since we have found as a fact that the advances created a debtor-creditor relationship between Smith Petroleum and petitioner. The advances by petitioner to Smith Petroleum having been conditioned upon repayment are not deductible as ordinary and necessary business expenses. *Henry F. Cochrane*, 23 B.T.A. 202 (1931); *Glendinning, McLeish & Co.*, 24 B.T.A. 518 (1931), affd. 61 F. 2d 950 (C.A. 2, 1932); *Josef C. Patchen*, 27 T.C. 592 (1956), affirmed in part and reversed in part on other grounds 258 F. 2d 544 (C.A. 5, 1958).

Thus, the only remaining question is whether the advances constitute business or nonbusiness bad debts. This question is essentially a question of fact, *Stuart M. Sales*, 37 T.C. 576 (1961); the determination of which depends upon whether the debt is "proximately related" to the trade or business of the taxpayer. Sec. 1.166-5(b)(2), Income Tax Regs.; *Whipple* v. *Commissioner*, 373 U.S. 193 (1963); *I. Hal Millsap, Jr.*, 46 T.C. 751 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968).

Petitioner maintains that his advances to Smith Petroleum were proximately related to his road construction business which he operated as a sole proprietorship in that the advances protected his credit rating and reputation which was essential for securing surety bonds required in his road construction business. Petitioner does not maintain that the advances protected his trade or business of being an employee of Smith Petroleum, see *Trent* v. *Commissioner*, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910 (1960), nor does he argue that he was in the business of lending money or of promoting, financing, and managing enterprises.

---

[4] SEC. 166. BAD DEBTS.

   (d) NONBUSINESS DEBTS.—

     (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

       (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

       (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

     (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

       (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

       (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

In determining whether the requisite "proximate relationship" exists, the courts have primarily focused on the motivation of the taxpayer in making the loan. See *Weddle* v. *Commissioner*, 325 F. 2d 849 (C.A. 2, 1963), affirming 39 T.C. 493; *Niblock* v. *Commissioner*, 417 F. 2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court; *United States* v. *Generes*, 427 F. 2d 279 (C.A. 5, 1970). See also *Stratmore* v. *United States*, 420 F. 2d 461 (C.A. 3, 1970). Motivation, however, is not the only factor that must be considered in determining whether a debt is to be classified as business or nonbusiness. Intentions alone cannot make a bona fide business loan out of a loan which is not related to the conduct of the trade or business of the taxpayer. Thus, without regard to motivation, the taxpayer must first show that there was a relationship between the loans and resulting losses and a trade or business engaged in by the taxpayer. If such a relationship is shown then motivation becomes relevant in determining whether the debt was in fact incurred in connection with, or was proximately related to, taxpayer's trade or business.

We think the facts established by the evidence in this case show that the loans and resulting debts could well have been created in connection with petitioner's road construction business. At the time that petitioner made the advances to Smith Petroleum, petitioner was extensively engaged in building public roads. In order to get a public road contract petitioner had to, besides being the low bidder, submit a surety bond for the amount of the contract. The surety company from which petitioner purchased his bonds required petitioner, among other things, to maintain a good credit rating. The evidence clearly shows that petitioner did maintain a good credit rating and that this was a vital factor considered by the surety company in issuing bonds to petitioner for use of his road construction business. The evidence also clearly reflects that had Smith Petroleum not paid its debts petitioner's credit rating would have been adversely affected with the result that petitioner's' bonding capacity would also have been adversely affected.

Respondent, however, maintains that the advances were not necessary to protect petitioner's credit rating. He argues that there is no evidence to show that Smith Petroleum could not have ceased operation in 1963 and settled its financial obligations with the result that petitioner would not have had to make the advances to protect his credit rating. In this regard petitioner testified that if Smith Petroleum had ceased operation in 1963, the Cardwell travelrig and any other equipment being financed would have been repossessed and that he was afraid of the effect of a repossession on his credit rating. We think petitioner's concern in this regard was reasonably founded. Certainly a repossession or a failure on the part of Smith Petroleum to meet its obligations to third parties would have adversely affected

petitioner's credit rating and reputation because in the community where petitioner lived and did business he and Smith Petroleum were considered to be the same. Furthermore, petitioner did in fact attempt to cease the operations of Smith Petroleum in the sense that he made efforts to sell his interest in Smith Petroleum on at least two occasions. Undoubtedly, by advancing funds to Smith Petroleum so that it could continue in operation, petitioner was also protecting his investment. But we think the evidence reasonably supports petitioner's testimony that if Smith Petroleum had ceased operations in 1963, this would have been detrimental to his credit rating.

We think the record before us amply supports petitioner's contention that the advances in question did have a direct relationship with petitioner's trade or business. At the same time, however, we think it is clear that the advances had a direct effect upon petitioner's investment interest in Smith Petroleum. Indeed, petitioner was the dominant or sole stockholder at the time he made the advances and also was the only person who had invested money in the corporation.

Since the advances were not only related to the conduct of petitioner's trade or business but were also peculiar to petitioner's role as an investor, we must look to the motivation of petitioner in making the advances in order to determine whether the debt was business or nonbusiness. Respondent, citing *Niblock* v. *Commissioner, supra,* contends that the advances must have been "primarily or dominantly motivated" by petitioner's trade or business for the advances to be classified as business debts. Petitioner, however, citing *Weddle* v. *Commissioner, supra,* claims that he must only show that he was "significantly motivated" by his trade or business in making the advances.

We note that the Fifth Circuit, wherein an appeal from this case would lie, has just recently decided in *United States* v. *Generes, supra,* to follow the Second Circuit in only requiring a "significant motivation" for the debt to be labeled a business debt. Therefore, under the rule recently adopted by this Court in *Jack E. Golsen,* 54 T.C. 742 (1970), on appeal (C.A. 10, May 4, 1970), we are required to apply the significant-motivation test in the instant case in reaching our ultimate decision. The *Golsen* rule, however, is only a rule of practicality to foster "efficient and harmonious judicial administration" and does not permit us to avoid our judicial responsibility as a court of national jurisdiction to express our opinion as to the proper test to be applied, particularly where there is a disagreement among the Courts of Appeals as to the proper test.[5]

Inasmuch as this Court has not taken a position since the conflict

---

[5] We stated in *Jack E. Golsen,* 54 T.C. 742, 757: "We shall remain able to foster uniformity by giving effect to our own views in cases appealable to courts whose views have not yet been expressed, and, even where the relevant Court of Appeals has already made its views known, by explaining why we agree or disagree with the precedent that we feel constrained to follow."

arose in the circuits as to the requisite degree of motivation required, we have carefully considered the views of the Second and Fifth Circuits (significant) and the Seventh Circuit (primary). We agree with the Seventh Circuit that "the only test that will inject sufficient certainty into the interpretation of Section 166 * * * is the dominant and primary motivation test." As we stated in *George P. Weddle*, 39 T.C. 493 (1962), since we have no "scales sufficiently sensitive to be able to ascertain the exact percentage of motivations * * *, we look to the main and dominant reason for their actions." We do not adopt the significant-motivation test not only because it fosters uncertainty and is inconsistent with the long course of decisions in which section 166 and its predecessors have been considered, see opinion of this Court and the concurring opinion of Chief Judge Lumbard in *Weddle* v. *Commissioner, supra,* but also because in some cases it would permit a taxpayer to deduct a bad debt loss in full even though the debt was primarily motivated by nonbusiness reasons. This in our opinion is not the result intended when Congress enacted the nonbusiness bad debt provision. See discussion in *Whipple* v. *Commissioner, supra.* We agree with the Court of Appeals in *Niblock* v. *Commissioner, supra,* that the Supreme Court was pointing to a primary-motivation test in the *Whipple* opinion.

Peitioner testified that his only purpose for making the advances to Smith Petroleum was to protect his credit rating and thereby his bonding capacity. He further testified that he was not motivated by his investment in Smith Petroleum to make the advances. While we find it somewhat difficult to believe that petitioner was not concerned with his $20,000 investment and with making a success of the oil well servicing business when he made the advances, we do believe that petitioner was also motivated by his credit rating and reputation in making the advances.

Petitioner's testimony is supported by the fact that the local agent of the surety company with which petitioner dealt advised him that a poor credit rating of Smith Petroleum would reflect on his personal credit rating. Also the bond department manager had impressed upon petitioner the necessity of maintaining a good credit rating. Moreover, since 1948 the road construction business has constituted petitioner's principal source of income, whereas Smith Petroleum was only in existence from 1960 through early 1966, losing money in every year except 1962. It would seem that petitioner should have been more concerned about protecting his principal source of income than with protecting an investment of $20,000 in a business in which he had no experience. Also, we find it hard to conceive that petitioner would make advances in 1963, 1964, and 1965 totaling $84,221.39 and an additional advance of $6,843.44 in 1966, for the sole purpose of protecting an investment of $20,000.

Respondent argues, however, that it is evident from the fact that the advances for current operating expenses extended over a 3-year period, during most of which time petitioner was attempting to sell the business, that petitioner's primary purpose was to protect and recoup his investment in Smith Petroleum. Certainly this could not have been his motivation in making advances in excess of $6,000 in 1966 after Smith Petroleum had ceased business activities. As we stated earlier, we have no doubt that petitioner was somewhat motivated in making the advances by the fact that he had $20,000 invested in Smith Petroleum. We are not persuaded, however, that this was his primary concern either by the fact that the advances extended over 3 years or by the fact that he attempted to sell his interest in Smith Petroleum during this time. In our opinion these facts only point out that petitioner was motivated by dual desires—to protect his credit rating and to protect his investment.

At the trial, we found petitioner's testimony to be both candid and honest; and there was no direct evidence contradicting him. While we might find it more difficult to conclude that petitioner's primary and dominant motivation in making the loans to Smith Petroleum was to protect his credit rating, we are convinced that this was a significant motivation for him to make the loans. Inasmuch as we must apply the test used by the Court of Appeals for the Fifth Circuit in deciding this case, *Jack E. Golsen, supra,* which is the "significant motivation" test, *United States* v. *Generes, supra,* we conclude that under that test the losses incurred by petitioner from the debts becoming worthless were proximately related to petitioner's trade or business and are deductible as business bad debts under section 166(a)(1), I.R.C. 1954.

Reviewed by the Court.

*Decision will be entered under Rule 50.*