Ross D. Hogue and Mildred M. Hogue v. Commissioner.
Hogue v. Commissioner
Docket No. 5967-68.
United States Tax Court
T.C. Memo 1971-75; 1971 Tax Ct. Memo LEXIS 256; 30 T.C.M. (CCH) 311; T.C.M. (RIA) 71075; April 19, 1971, Filed *256 Petitioner, a CPA, helped to initiate several corporations. One of these, A corp., never began the active conduct of business. When one of the owners of one of petitioner's clients (B corp.) wished to sell his interest petitioner arranged a transaction with A, so that A became the controlling shareholder. Petitioner was in control of A. Held, notes signed by petitioner as guarantor of B corp. were loans, not contributions to capital and petitioner's payment thereof gave rise to a nonbusiness bad debt, not a business bad debt, since there was no proximate relationship between petitioner's trade or business and the notes guaranteed. George Voss, First Nat'l Bank Bldg., Dodge City, Kan., for the petitioners. G. Phil Harney, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in petitioners' 1964 Federal income tax in the amount of $3,946.36. The issue before us is whether petitioners are entitled to treat the amount of $19,345.83, paid to satisfy the debts of a corporation, 312 as a business bad debt under section 166(a), I.R.C. 1954, [1] or whether such amount was a contribution to capital of said corporation *257 or whether such amount was a nonbusiness bad debt of petitioners to be treated in accord with section 166(d). Findings of Fact Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. Ross D. Hogue and Mildred M. Hogue (hereinafter the designation petitioner shall refer solely to Ross D. Hogue) were residents of Dodge City, Kansas at the time of filing their petition herein. Their joint Federal income tax return for the taxable year 1964 was filed with the district director of internal revenue, Wichita, Kansas. Petitioner has been a practicing certified public accountant since 1942 and has practiced continually in the city of Dodge City, Kansas, since that time. He is the senior member of the CPA firm of Hogue, Beebe & Trindle, which originally was named Ross D. Hogue & Company. In 1946 Ross D. Hogue & Company was the only active practicing CPA firm in the Dodge City area. At that time the businesses in the Dodge City area consisted primarily of partnerships and proprietorships. About 1946 the corporate form of conducting *258 business came into popularity in the Dodge City area. Petitioner initiated the organization of Dodge City Industries, Inc. by inducing businessmen of his acquaintance in the Dodge City area to invest $500 each in the formation of Dodge City Industries, Inc. Dodge City Industries, Inc. was incorporated July 29, 1946, with 11 stockholders, one of whom was petitioner. He became secretary of the corporation and his public accounting firm furnished all of the accounting services and office space. Subsequent to the formation of Dodge City Industries, Inc., its corporate purpose was narrowed from that of promoting new industries in Dodge City to one confined to the milo and cereal grain industry. As a result, its name was changed to Grain Products, Inc. on May 31, 1950. The stockholder list grew to 400 stockholders, with $700,000 contributed capital. Hogue was vice president and secretary during the 1950,s, and in 1960 became secretary-treasurer of the corporation. Payments made to Hogue, Beebe & Trindle for accounting fees by Grain Products, Inc. and its predecessor, Dodge City Industries, Inc., for the period 1952 through 1968 totaled $71,982.71. In addition, Hogue received an annual salary *259 as an officer and participated in the profit-sharing plan started in 1954 and in the pension plan started in 1960. After the plant was in full operation Hogue received a salary of about $7,000 or $8,000 for a year or two and this salary was gradually reduced until it came to around $3,000 a year, which salary was continued through 1968. Grain Products, Inc. became one of the largest clients in total fees of Hogue, Beebe & Trindle. The firm also received accounting fees for performing accounting services for Grain Products Profit-Sharing Plan. As a result of being an officer in Grain Products, Inc., petitioner was able to meet many of the stockholders and some of these became clients of his firm. Of 400 stockholders of Grain Products, Inc., 35 stockholders were clients of Hogue, Beebe & Trindle at the time of the formation of the corporation of Grain Products, Inc., and 73 became clients of Hogue, Beebe & Trindle after the formation of Grain Products, Inc.
Petitioner conceived and organized Grain Products Terminal Elevator, Inc. (hereinafter Grain Products) in about 1955. Grain Products was incorporated on July 21, 1955, to operate a public grain elevator. Hogue was president originally *260 and later became secretary-treasurer. The public accounting firm of Hogue, Beebe & Trindle performed all accounting services, and for the period 1955 through 1967 received approximately $33,413.34 in accounting fees. In 1967 Grain Products consolidated with Grain Products, Inc.
Grain Products operated a public grain elevator with about a million-bushel capacity and provided the raw products for Grain Products, Inc. Petitioner performed all of the accounting services for Grain Products. He had a small minority stockholder's interest in both Grain Products, Inc. and Grain Products. The Journal, Inc., Dodge City, Kansas, was incorporated on February 1, 1947, beginning with five stockholders, petitioner being one of them. This corporation was 313 reorganized several times, had several name changes, and was finally liquidated in 1959 and reincorporated as High Plains Publishers. At the time of reincorporation it became a subsidiary of McCormick-Armstrong, Inc., Wichita, Kansas. From its incorporation to its reincorporation, petitioner had been a stockholder and director, and sometimes an officer, and the firm of Hogue, Beebe & Trindle furnished accounting services until 1960. During that *261 period of time Hogue, Beebe & Trindle received approximately $3,730.84 in accounting fees. Greek Builders, Inc., Dodge City, Kansas, was incorporated on June 3, 1958, and has approximately 60 stockholders. Petitioner is president and treasurer, his wife is secretary, and his son is vice president. Hogue, Beebe & Trindle has furnished office services and some accounting services and has received nominal fees, mostly reimbursement of expenses, every year since Greek Builders was incorporated. Petitioner has not received remuneration or dividends from this corporation. Petitioner conceived and organized Greek Builders, Inc., the corporate purpose being to experiment with slip-form concrete and see if it was adaptable to apartment houses and buildings. Before the corporate purpose could be realized the financier of the project, one Chalmers, passed away. Chalmers' partners in his construction firm were not sympathetic toward the ideas of the corporation and consequently Greek Builders has been mostly dormant since Chalmers' death. The stock ownership of Greek Builders, Inc. consists of preferred stock, A and B, totalling $210,100 of capital stock, and common stock totaling $10,000. Petitioner *262 has a majority (9,440 out of 10,000 shares) of the common stock but a very insignificant amount of preferred stock. Class A preferred stock of Greek Builders, Inc. provides that in the event dividends are more than $18 in arrears per share the stock shall attain voting privileges of 100 votes for each $100 share. Class B preferred stock provides that in the event dividends are more than $6 in arrears per share the stock shall attain voting privileges of 100 votes for each $100 share. Dividends were not paid to all of the preferred stockholders each year as required. The majority of the class B preferred stock is owned by Mullin Furniture, Inc. (600 out of 881 shares). Mullin Furniture also owns more than onefourth of the class A preferred stock (318 out of 1,220 shares). All of the common stock owned by Hogue in Greek Builders, Inc. was retained in escrow by the Securities Commission of the state of Kansas and is to remain so until the payment of a 6 percent dividend on said common stock. Such a dividend has never been paid. Mullin Furniture, Inc., Dodge City, Kansas, was incorporated on January 1, 1947, incorporating a partnership called Mullin Brothers Furniture Company which was *263 operated by two brothers. Mullin Furniture, Inc. consisted of five stores located in Larned, Great Bend, Liberal, Garden City and Dodge City, Kansas, with a volume of over $1,000,000. During the years 1952 through 1968 the CPA firm of Hogue, Beebe & Trindle received fees of at least $19,074.65 from Mullin Furniture, Inc. In addition, Hogue, Beebe & Trindle received fees from Mullin Furniture, Inc. for the years 1946 to 1952 and specifically during one of those years received a total of $6,000 or $500 a month for accounting services relating to supervision of their entire accounting system and revising that system, and a specific fee of $15,000 concerning an income tax examination. In addition to Mullin Furniture, Inc., Hogue, Beebe & Trindle performed services for other Mullin interests, including J. D. Mullin, Mullin Investments, Inc., and other members of the Mullin family, for which Hogue, Beebe & Trindle received payment for accounting services and income tax return preparation. Petitioner acquired one share of nonvoting stock of Mullin Furniture, Inc. in 1961. This share of stock was traded for a voting share after he became a director and officer in 1961 when he took over the *264 management and presidency of the firm. Mullin Investment, Inc. was formed by the Mullin brothers of Mullin Furniture, Inc. and was incorporated on May 1, 1947. Hogue, Beebe & Trindle received payments totalling $3,606.94 for the period of 1958 through 1968. Mullin Furniture Employees Profit-Sharing Trust was organized in 1958. Hogue's firm took care of all the accounting, reports, tax reports, etc., resulting in fees of approximately $898.59 from 1960 through 1968. After the death of J. D. Mullin, M. E. Mullin, the surviving member of the original Mullin partnership, who was unfamiliar with the financial and administrative operations of Mullin Furniture, Inc., relied on petitioner in this connection. After a time he prevailed upon petitioner to work out a plan whereby he, Mullin, could relieve 314 himself of the responsibility of Mullin Furniture, Inc. and withdraw his investment in the corporation. Pursuant to M. E. Mullin's request petitioner worked out various plans, none of which were acceptable to Mullin. Finally, petitioner was able to arrange an acceptable transaction involving the sale of the corporation's receivables to Bankers Investment Company in Hutchinson, Kansas. The *265 transaction consisted of Greek Builders, Inc. purchasing from M.E. Mullin and J. D. Mullin Trust 3,259 shares from M. E. Mullin and J. D. Mullin Trust 3,259 shares of Mullin Furniture, Inc. voting stock. Greek Builders, Inc. purchased Mullin Furniture, Inc. account receivables from Mullin Furniture, Inc. for $334,933, and paid for said receivables with 2,341 shares of Mullin Furniture, Inc. stock (which upon receipt were canceled and became Treasury stock), 918 shares of Greek Builders stock and cash of $9,033. Greek Builders, Inc. sold the Mullin Furniture, Inc. receivables to Bankers Investment Company for $375,869.90. Thereafter, Greek Builders, Inc. had voting control of Mullin Furniture, Inc. (918 out of 1,000 shares). At first, after the acquisition of control of Mullin Furniture, Inc., the stores operated successfully. However, gradually the stores slipped and began losing money. Petitioner began to make efforts to save the stores and instituted several plans, one of which involved contracting the size of the business by first eliminating the Larned store. Ultimately all but the Dodge City store were eliminated. Prior to this time petitioner had established a line of credit *266 with First National Bank in Dodge City and Fidelity State Bank of Dodge City, Kansas. At that time he felt that the account receivables would be sufficient to liquidate the lines of credit. After reducing the corporation to one store, Mullin Furniture, Inc. lost its lease in Dodge City and was forced to liquidate. At the time of securing the lines of credit petitioner did not have in mind liquidating the store in Dodge City. All of the assets of Mullin Furniture, Inc. were substantially disposed of in 1964. The petitioner on December 30, 1964, issued checks of $13,270.83, to the First National Bank of Dodge City, Kansas, and of $6,075 to the Fidelity State Bank of Dodge City, Kansas, in payment of promissory notes, together with interest. These payments were on two promissory notes which petitioner had signed as president of Mullin Furniture, Inc., and individually, as a guarantor, in the event that Mullin Furniture, Inc., did not pay the same. The check to the First National Bank of Dodge City was in payment of a $13,000 note issued August 27, 1964, payable 180 days after date. The check to the Fidelity State Bank was in payment of a $6,000 note issued on October 1, 1964, and due *267 on demand after date. In their 1964 income tax return, petitioners claimed as a business deduction from gross income, payments on notes, including interest, in the total amount of $19,345.83. It is stipulated that there is no dispute as to the amount of the $19,345.83 claimed on the 1964 income tax return, or the fact that the $19,345.83 was paid by petitioner in the year 1964. In his notice of deficiency the Commissioner disallowed the deductions of $13,270.83 and $6,075, stating that he determined such amounts to be contributions to capital and not loans. However, he further stated that if such sums were found to be loans, then the debt was a nonbusiness bad debt as opposed to a business bad debt in that it was not created in connection with petitioner's trade or business. Opinion We must decide whether the amount of $19,345.83 paid by petitioner on two notes of Mullin Furniture, Inc., which he guaranteed, represents contributions to capital or if not, whether such amount is either a business or nonbusiness bad debt. Dealing first with the theory that the amount in question was a contribution to capital we cannot agree. We find no evidence in the record herein to support that conclusion. *268 It would seem that a business with gross sales in excess of one million dollars and with a book capitalization in excess of $208,000 would benefit only in the slightest degree from an infusion of $20,000 worth of new capital. We find nothing to support the Commissioner's assertion that Mullin Furniture was under-capitalized and "perhaps insolvent" at the time petitioner guaranteed the notes in question. Turning our attention to the alternative theory that the payments on the notes gave rise to a bad debt deduction, we believe that in the circumstances herein, petitioners are only entitled to a nonbusiness bad debt deduction as defined in section 315 166(d) [2] *269 and not a business bad debt deduction as stated in section 166(a). [3]
To be entitled to a business bad debt deduction petitioner must show that the debt was proximately related to his trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). It is incumbent on petitioner, therefore, to show a relationship between the loans and resulting losses and a trade or business engaged in by him. Oddee Smith, 55 T.C. 260 (1970), on appeal (C.A. 5, March 2, 1971). Petitioner attempts to establish the necessary relationship in the following manner. As early as 1946 petitioner, a CPA, began to be instrumental in the organizing and reorganizing of companies and corporations with the purpose of creating a clientele. In addition, he became an officer in some of these corporations, thereby qualifying to draw a salary and later, *270 when profit-sharing plans became more popular, petitioner, as an employee of these corporations, became eligible to participate in such profit-sharing plans. Petitioner never did invest large amounts of money in these corporations, as investment was never a dominant motive in the organizing and operation of the corporations. This plan of obtaining clients was of substantial value to his accounting firm in that he created a corporation, Grain Products, Inc., which became for many years the best client of the accounting firm, generating substantial fees over a period of years. In 1947 petitioner also began to perform accounting work for the Mullin interests. Later he helped and assisted in the organization of Mullin Furniture, Inc., a corporation, and over the years he and his firm received substantial fees from this corporation and other Mullin interests. In 1960 he began to see that Mullin Furniture, Inc. might be liquidated. Petitioner did not want to lose the corporation as a client nor did he want to lose the accounting work of the other Mullin interests. Therefore, he finally came up with a plan utilizing his method of organizing corporations to create clients. He made arrangements *271 with Greek Builders, Inc., a corporation originated by petitioner, and through a three-way transaction involving Mullin Furniture, Inc., Greek Builders, Inc., and Bankers Investment Company of Hutchinson, he was able to work out a plan whereby Mullin stock could be redeemed, Greek Builders, Inc. would have control of Mullin Furniture, Inc., and Mullin Furniture would continue to be a client of petitioner's firm. This plan appeared to work for a time and he set up a line of credit with both First National Bank in Dodge City and the Fidelity State Bank of Dodge City, and he agreed to pay the notes involved in this case if Mullin Furniture, Inc. could not. Subsequently, Mullin Furniture, Inc. lost its lease and was forced to liquidate. In 1964 the assets of the corporation were substantially all disposed of and petitioner had to make good on his guarantee. Petitioner contends that the debts involved in this case were motivated by business reasons. These reasons included the saving of a client for the petitioner's firm, thus generating fees; the securing of a client with the type of business that would justify a punchcard accounting machine; a chance of obtaining a $25,000 a year salary *272 which Mullin had drawn prior to the redemption of his stock; the ability to participate in another profit-sharing plan; and the opportunity to enhance his reputation in the management services field. Petitioner's contentions are quite well drawn, in fact so well drawn that they fit almost perfectly into our decisions in two similar cases, one a Memorandum Opinion [4] and the other, Stuart Bart, 21 T.C. 880 (1954). We cannot fault him for his attempt. However, it must be borne in mind that petitioner comes to us bearing the burden 316 of proof, Rule 32, Tax Court Rules of Practice, and merely characterizing the facts in one case in such a way as to resemble those in others will not suffice if significant differences appear, or, if the facts in the case presently before the Court belie the characterization placed on them by the petitioner. We first note that petitioner does not claim to be in the business of making loans, that he did not seek out loan customers, advertise that he was in the business of loaning money, nor did he maintain a separate office or books of account relative to any loan business. In addition, there is no claim that petitioner *273 was in the separate business of promoting, financing or organizing corporations. Petitioner's only avenue of success, therefore, is to show that the making of the loans in question was proximately related to his business of being an accountant. This we find he has not done. We do not think his claim that he was instrumental in organizing the various corporations mentioned in our Findings of Fact so as to create clients for his accounting practice is well founded. Grain Products was begun in 1946 [5] at a time when petitioner's firm was the only CPA firm in Dodge City. Also, the local chamber of commerce, of which petitioner was a member, had decided that it would be good for the community to bring in new business. It was then that petitioner proceeded to help organize Grain Products. It would seem obvious that the original idea of luring new business into Dodge City was not that of petitioner, but rather of the community's business leaders in general. It would also seem apparent that petitioner's firm would be a logical choice as the accountants for new businesses in that his firm was the only one practicing in the Dodge City community. Thus we find it difficult to place great weight *274 on petitioner's claim that he "conceived the idea of obtaining clients for his firm by the creation of clients through the form of instigating the formation of corporations as new industries or businesses in Dodge City." We think that the same reasoning applies equally well to the Journal, which was incorporated in 1947. As to the Grain Products Terminal Elevator Co., it would appear to have been a natural offshoot of Grain Products, Inc., which was a longstanding client of petitioner's by 1955.It was built with the express purpose of serving as a stable source of grain for Grain Products, Inc., a facility that Grain Product already needed, but for which it had insufficient funds. It appears from the record that Grain Products, Inc., was of economic importance to the Dodge City community and the establishing of a stable source of supply for it would seem to be in the community interest. We cannot find that petitioner organized Grain Products with *275 the idea in mind of creating another client, for the facts will not support such a conclusion. We next come to Greek Builders, Inc. This was the only corporation in which petitioner had a significant investment and interest; approximately $9,400 and 94 percent of the common stock. However, due to initial difficulties the corporation had not become an active one. It lay dormant until petitioner effected the transaction with M. E. Mullin, and Greek Builders ended up with 918 shares out of a possible 1,000. After years of dormancy, Greek Builders finally had something which could enable it to become a going business and also enable petitioner to release his majority interest from escrow. We are of the opinion that petitioner guaranteed the notes of Mullin Furniture with the hope that he could save his investment in Greek Builders and realize something on it and not for the claimed reason that he guaranteed the notes to preserve an existing client. The use of Greek Builders in the transaction with M. E. Mullin brings to mind several questions about the previous efforts of petitioner in securing a buyer for Mullin's interest especially in light of the fact that petitioner was aware that *276 Mullin was drawing $25,000 a year from the company. We believe that petitioner has not shown that there was the requisite relationship between the loans and resulting losses and his business of being an accountant, Oddee Smith, supra, necessary for a finding that the loans in question gave rise to a business bad debt deductible under section 166(a). Therefore, we need not concern ourselves 317 with the motivation of petitioner for making the guarantees on the notes herein since motivation becomes an issue only after the required proximate relationship is found. Oddee Smith, supra. Accordingly, Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. SEC. 166. BAD DEBTS. (d) Nonbusiness Debts - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
3. SEC. 166(a). General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *↩
4. Frank A. Garlove, 24 T.C.M. 1049↩ (1965).
5. Although the corporate name was not changed from Dodge City Industries, Inc. to Grain Products, Inc. until 1950, we shall refer to the corporation as Grain Products throughout the opinion portion of this decision for purposes of clarity.↩