**UNITED STATES of America,**
**Appellant,**

v.

**Edna GENERES, Wife of, and Allen H.**
**Generes, Appellees.**

**No. 25713.**

United States Court of Appeals,
Fifth Circuit.

May 25, 1970.

Simpson, Circuit Judge, dissented and filed opinion.

Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, William A. Friedlander, Stephen H. Paley, Richard C. Pugh, Attys., Dept. of Justice Tax Div., Washington, D. C., Louis C. LaCour, U. S. Atty., Joan Elaine Chauvin, Asst. U. S. Atty., New Orleans, La., for appellant.

Max Nathan, Jr., New Orleans, La., for appellees.

Before AINSWORTH and SIMPSON, Circuit Judges, and SINGLETON, District Judge.

AINSWORTH, Circuit Judge:

By this appeal the United States brings here for review a jury verdict and judgment below for the taxpayer [1] in an income tax refund suit. Taxpayer, in the early 1940's, entered into a partnership engaged in the construction business in New Orleans, Louisiana, with his son-in-law, William F. Kelly, who had already established the business. Taxpayer and Mr. Kelly were equal partners in this operation.

In 1954, the partnership was incorporated as Kelly-Generes Construction Company, Inc., which was engaged primarily in heavy construction work for various federal, state, city and public authorities. The corporation was essentially a closed family corporation with taxpayer and Mr. Kelly each owning 44 per cent of the corporate stock. The remaining 12 per cent of the stock was divided between another son-in-law of taxpayer, Mr. Louis Treuting, and taxpayer's son, Allen H. Generes, Jr.

Taxpayer was president of the corporation and in that capacity spent only approximately six to eight hours per week attending to the affairs of the corporation. His principal duties as president of Kelly-Generes Construction Company, Inc. were to obtain bank financing for corporate activities and to secure performance and bid bonds on construction jobs undertaken by the company. In his individual capacity, taxpayer endorsed loans made to the corporation by various banks in New Orleans for the purpose of purchasing construction machinery and other equipment. In addition, taxpayer from time to time personally advanced funds to the corporation. Taxpayer, as president of the corporation, received a salary of $12,000 per year and Mr. Kelly, as vice-president and the one in charge of the day-to-day operations of the corporation, received a salary of $15,000 per year.

During all the years in question, taxpayer was the president of Central Savings and Loan Association in New Orleans of which he was the founder. This was a full-time job for which he received a salary in the amount of $19,000 per year. In addition, taxpayer had other sources of income; his federal tax returns for the years 1959 through 1962 indicate an average income of approximately $40,000 a year. Taxpayer, during the years in question, maintained bank accounts ranging in total amount from $30,000 to $55,000.

The construction contracts undertaken by the corporation generally required performance and payment bonds, the greatest number of which were obtained from the Maryland Casualty Company. Taxpayer was required to sign separate indemnity agreements with Maryland Casualty Company for each bond issued by that company for a job being per-

1. Throughout this opinion "taxpayer" will be used in the singular to refer to the husband, Allen H. Generes, since his wife is a party only because joint returns were filed for two of the taxable years here involved.

formed by Kelly-Generes Construction Company, Inc. These indemnity agreements provided that taxpayer agreed to hold Maryland Casualty Company harmless from any losses suffered by reason of any defaults by the corporation which would require the surety company to perform or pay under its bonds.

Subsequently, in December of 1958, it was decided that it would be advisable for taxpayer to execute a blanket indemnity agreement in lieu of signing a separate indemnity agreement for each construction job. Thus, on December 3, 1958, an instrument entitled "Blanket Indemnity Agreement" with Maryland Casualty Company was signed by the corporation as applicant, through taxpayer its president, and in addition was signed individually by taxpayer and William Kelly as indemnitors. Under this agreement, taxpayer agreed to hold harmless the Maryland Casualty Company from any loss sustained as a result of its bonding the construction jobs of Kelly-Generes. At the same time, Maryland Casualty Company agreed to increase the surety credit of Kelly-Generes from approximately $1,000,000 to $1,500,000 for any one job and to a total credit line of $2,000,000 inclusive of all jobs bonded by them.

In 1962, Kelly-Generes underbid on two important projects and defaulted in the performance of its contracts. As a result, Maryland Casualty Company was forced to complete performance. Subsequently, Maryland Casualty Company sought enforcement of the indemnity agreement of December 3, 1958 against taxpayer and Mr. Kelly, and as a result the taxpayer, in 1962, was forced to pay $162,104.57 to Maryland Casualty Company. Kelly-Generes eventually went into receivership and taxpayer was unable to collect the above amount from the company as a subrogated creditor.

On the federal income tax return for 1962, taxpayer deducted the amount of the payment to Maryland Casualty Company as a business bad debt and subsequently filed claims for refund for the years 1959, 1960 and 1961 by virtue of a net operating loss carryback to those years arising from the unused portion of the 1962 business bad debt deduction. The Internal Revenue Service paid the claim upon the filing by taxpayer of the tentative carryback claim. However, the Internal Revenue Service later disallowed the net operating loss carryback on the ground that the payment by taxpayer to Maryland Casualty Company did not give rise to a business bad debt deduction.[2] Accordingly, assessments in the aggregate amount of $43,851.46 plus statutory interest were made against taxpayer on May 28, 1965. Payment of these assessments was received by the Internal Revenue Service on June 2, 1965, and, on June 8, 1965, taxpayer filed claims for refund of the amount previously paid. These were denied by the Commissioner and the suit below was timely filed thereafter.

Trial was before a jury. Both parties unsuccessfully moved for directed verdicts at the close of all the evidence. Upon submission by special issues the jury returned a verdict under which the taxpayer was entitled to recover the amount in suit. The Government then moved for judgment n.o.v. and alternatively for a new trial. These motions were denied, judgment was entered in accordance with the verdict and this appeal followed. We affirm.

The facts recited above are as set forth in the Government's brief and are not disputed by taxpayer. The sole question presented is whether the taxpayer's loss gave rise to business bad debts within the meaning of 26 U.S.C. §

---

2. If the bad debt in question could be classified as a business bad debt under 26 U.S.C. § 166(a) (1), the net operating loss carryback would be proper under the provisions of 26 U.S.C. § 172. If, however, the bad debt was of a nonbusiness nature as defined by 26 U.S.C. § 166(d), the taxpayer could not avail himself of the net operating loss carryback. 26 U.S.C. § 172(d) (4).

166.[3] In order to answer that question, it is necessary to determine whether the taxpayer's endorsement was motivated out of a desire to protect his trade or business, i. e., that of being president of the Kelly-Generes Construction Company. See Kelly v. Patterson, 5 Cir., 1964, 331 F.2d 753; Trent v. C. I. R., 2 Cir., 1961, 291 F.2d 669.

Treas.Reg. § 1.166–5(b), 26 C.F.R. § 1.166–5(b), provides that the debt is deductible as a business bad debt only if "the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer" is *"proximate."* (Emphasis added.)

The Supreme Court indicated its approval of the "proximate relationship" test in Whipple v. C. I. R., 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963). In vacating and remanding *Whipple* to the Tax Court for a determination of whether a taxpayer's loan was made in his business of being a landlord, the Court noted:

> "Moreover, there is no proof (which might be difficult to furnish where the taxpayer is the sole or dominant stockholder) that the loan was necessary to keep his job *or was otherwise proximately related* to maintaining his trade or business as an employee."

373 U.S. at 204, 83 S.Ct. at 1175. (Emphasis added.)

The District Court's sole interrogatory to the jury, answered in the affirmative, was phrased in terms of proximate relationship. The jury was asked:

> "Do you find from a preponderance of the evidence that the signing of the blanket indemnity agreement by Mr. Generes was proximately related to his trade or business of being an employee of the Kelly-Generes Construction Company?"

The Court instructed the jury that

> "A debt is proximately related to the taxpayer's trade or business when its creation was significantly motivated by the taxpayer's trade or business, and it is not rendered a nonbusiness debt merely because there was a non-qualifying motivation as well, even though the non-qualifying motivation was the primary one."

■ The Government urges that "dominant motivation" and not "significant motivation" was the appropriate test for determining the proximate relationship of the debt to the taxpayer's business and that the District Judge's charge to the jury was therefore erroneous. Neither the Supreme Court nor this Court has ruled on the precise question. However, the above-quoted language of the Supreme Court in *Whipple,* supra, which impliedly requires proof only that a loan be "proximately related" to the maintenance of a taxpayer's trade in order that a deduction be allowed, precludes the imposition of dominant motivation proof on the taxpayer. We are impressed with the majority holding in the Second Circuit decision in

---

3. The pertinent provisions of the statute are:

"§ 166. Bad debts

"(a) General rule.—

"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

\*   \*   \*   \*   \*

"(d) Nonbusiness debts.—

"(1) General rule.—In the case of a taxpayer other than a corporation—

"(A) subsections (a) \* \* \* shall not apply to any nonbusiness debt; and

"(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

"(2) Nonbusiness debt defined.—For purposes of paragraph (1), the term 'nonbusiness debt' means a debt other than—

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

Weddle v. C. I. R., 1963, 325 F.2d 849, and its analogy between proximate cause and significant motivation.[4]

The Court in *Weddle* in disavowing the "primary" motivation test as an erroneous view of law, said:

"That is not what is said either by the statute or by the Regulations, which the Supreme Court inferentially approved in Whipple v. C. I. R., 373 U.S. 193, 204, 83 S.Ct. 1168, 10 L.Ed. 2d 288 (1963). In the law of torts, where the notion of 'proximate' causation is most frequently encountered, a cause contributing to a harm may be found 'proximate' despite the fact that it might have been 'secondary' to another contributing cause. See 2 Harper & James, The Law of Torts, §§ 20.2 and 20.3; American Law Institute, Restatement, Torts, §§ 432(2), 433, 439, 875, 879 (1939); Restatement Second, Torts, § 443A at 54 (Tent. Draft No. 7, 1962), § 442B at 29 (Tent. Draft No. 9, 1963). So here, particularly in view of the back-handed wording of § 166, it suffices for deduction that the creation of the debt should have been significantly motivated by the taxpayer's trade or business, even though there was a non-qualifying motivation as well." 325 F.2d at 851.

We find no error in the District Court's instruction relative to the significant motivation of taxpayer in determining the proximate relation of a debt to his trade or business.

Therefore, if the evidence was such that the jury could have reasonably concluded that the taxpayer's endorsement was motivated by a desire to preserve his business of being a corporate employee the jury could have properly determined that the bad debt was proximately connected with the taxpayer's trade or business. Taxpayer repeatedly testified that he signed the agreement in order to protect his job and his salary as an officer of Kelly-Generes.[5] While admittedly much of the testimony was self-serving, the credibility and sincerity

---

4. The Government relies on a concurring opinion in *Weddle* which rejects the majority's "significant motivation" test and suggests as the proper criteria a "primary and dominant motivation."

5. The following cross-examination of Mr. Generes is pertinent:

"Q. Let me ask you what motivated you to endorse or sign those notes on behalf of the corporation?

"A. The corporation was paying me $12,000 a year. I had $38,000 in it, and I figured in three years' time I would get my money out. (App. 107)

\* \* \* \* \*

"Q. I believe you also stated you were interested in your salary because, if you did not sign the indemnity agreement, the Maryland Casualty Company wouldn't execute the bonds and Kelly-Generes Construction Company couldn't get contracts and, therefore, would go out of business, and you would lose your job; is that right?

"A. That is perfectly correct. (App. 118)

"Q. Is that the relationship between your signing of the indemnity agreement and your job?

"A. The reason I signed that indemnity agreement was to protect my job.

"Q. Through protecting your investment, through protecting Kelly-Generes Construction Company?

"A. The investment was very small, only $38,000, and I figured that if I signed this bond—I get $12,000 a year, in three years' time I would be practically paid out of my investment.

\* \* \*

"Q. At the time you signed it, did you give consideration to the fact that you were protecting your job and salary at the time you signed it?

"A. That's the reason I signed it. (App. 119)

"Q. To protect your job and salary?

"A. That's the reason I signed it.

"Q. Did you give any thought at all to your investment in the corporation?

"A. No, I never once gave it a thought. \* \* \* I never thought about dividends because we were growing, and I signed the indemnity bond for the purpose of protecting my salary, and that is what I had in mind. (App. 120) \* \* \* To tell you the truth about it \* \* \* I never gave that a thought. I never gave my investment a thought. That $1,000 a month I was getting and trying, as I said, to build up an estate for my children." (App. 122)

of taxpayer, the assessment of which is undisputably a jury function, were decided in his favor.[6] Moreover, there was uncontradicted testimony of witnesses other than taxpayer from which the jury could have inferred that taxpayer's motivation in endorsing the agreement stemmed from his desire to protect his job and consequently his salary. The record shows that no performance bonds would have been issued to Kelly-Generes without the personal endorsement of Mr. Generes. Without the bonds the corporation would have gone out of business. The corporation was a closed corporation, privately held and no stock was available to the general public. At no time did the corporation pay dividends to its shareholders.

The ultimate question, therefore, is whether the evidence formed a sufficient basis to justify the Trial Judge's submission of the case to the jury. The applicable standard is that expressed in our recent en banc decision, Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374–375:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise

of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." (Footnote omitted.)

Under the standards of Boeing we hold that the District Court properly denied the motions of the Government for judgment n.o.v. and for a new trial.

Affirmed.

SIMPSON, Circuit Judge (dissenting):

I respectfully dissent.

I believe that the only test that will inject sufficient certainty into the interpretation of Title 26, U.S.C. Section 166 is the *dominant and primary motivation test* articulated by Chief Judge Lumbard in his concurring opinion in Weedle v. Commissioner of Internal Revenue, 2 Cir., 1963, 325 F.2d 849, 851. The Seventh Circuit recently adopted this standard in Niblock v. Commissioner of Internal Revenue, 7 Cir., 1969, 417 F.2d 1185.

The bare self-serving statements of Taxpayer were the sole evidence offered by him as to his motivation. If the dominant motivation criterion had been applied, I do not think these statements

6. In United States v. Worrell, 5 Cir., 1968, 398 F.2d 427, this Court reversed and remanded a decision in favor of taxpayer under circumstances somewhat similar to to those here. At issue in *Worrell*, as here, was taxpayer's motivation in signing as an indemnitor of the corporation's surety creditor. However, one essential difference between *Worrell* and the present case exists. *Worrell* was tried to the Court entirely on stipulations and documentary evidence; there was no oral testimony and "no word from Mr. Worrell or anyone else as to what his motive was in signing these indemnity contracts." 398 F.2d at 428.

would have been sufficient under Boeing Company v. Shipman standards of proof,[1] to take the case to the jury in the face of the clear proof that Generes and Kelly were required to sign the endorsement in order for the corporation to engage in the construction business. This problem of proof was prophetically forecast by Whipple v. Commissioner, 373 U.S. 193, 204, 83 S.Ct. 1168, 1175, 10 L.Ed.2d 288, 295:

> "Moreover, there is no proof (*which might be difficult to furnish where the taxpayer is the sole or dominant stockholder*) that the loan was necessary to keep his job or was otherwise proximately related to maintaining his trade or business as an employee." (Emphasis supplied)

On this basis, I would reverse the judgment below and remand with directions to the trial court to enter judgment n.o.v. in favor of the United States.

---

1. The Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374, 375.