Walton M. Dallas and Elide M. Dallas v. Commissioner.
Dallas v. Commissioner
Docket No. 4712-69.
United States Tax Court
T.C. Memo 1971-248; 1971 Tax Ct. Memo LEXIS 82; 30 T.C.M. (CCH) 1071; T.C.M. (RIA) 71248; September 28, 1971, Filed. Robert W. Ryan, Jr., for the petitioners. Harold L. Cook, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $6,488.46 in petitioners' Federal income tax for the year 1963. In their amended petition filed herein on May 17, 1971, the petitioners claim an overpayment of income tax for 1963 on the ground that they are entitled to a business, rather than nonbusiness, bad debt deduction for that year. The issues for decision are: (1) Were advances totaling $29,800 made in 1963 by petitioner Walton M. Dallas to Texas Trinity Manufacturing and Supply Company, Inc., loans or capital contributions? (2) If loans, were *83 they business or nonbusiness debts? (3) If loans, did they become worthless by December 31, 1963, so that petitioners are entitled to a bad debt deduction in that year? Findings of Fact Some of the facts have been stipulated and are found accordingly. Walton M. Dallas and Elide M. Dallas are husband and wife whose legal residence was Dallas, Texas, at the time they filed their petition in this proceeding. They filed a joint Federal income tax return for the year 1963 with the district director of internal revenue at Dallas, Texas. Walton M. Dallas (herein called petitioner) was graduated in 1938 from Carnegie Tech in the field of management engineering. He was employed as a manager of manufacturing control or production manager by North American Aviation, Standard Steel Works, Darby Corporation and Temco (later Ling-Temco-Vought, Inc.) from 1938 to September 1, 1963. Petitioner started Texas Trinity Manufacturing and Supply Company as a partnership in 1959 to overhaul and repair aircraft components. On June 1, 1962, Texas Trinity was incorporated in Texas and continued in the same line of business. At the time of incorporation it employed about 30 full-time employees. The *84 original officers of Texas Trinity were as follows: Walton M. Dallas, president; Elide M. Dallas, secretary-treasurer; and Marvin K. Mills, vice president. During 1963 Lewis E. Goodman was also a vice president. Petitioner owned 10,000 shares of the outstanding stock in 1963 and Mr. Goodman held the remaining 250 shares. Practically all of Texas Trinity's business was the overhauling and manufacture of aircraft components under several contracts with the United States Air Force. There were two principal types of contracts with the Air Force: (1) Overhaul and repair of components, which required the disassembly and replacement of defective parts, and the reassembly, testing, and shipping of the various components, and (2) cleaning of oil coolers which was principally a cleaning operation with some little repair work. Some dividends were paid by Texas Trinity but most of the profits were retained in the business for future growth. For the fiscal year ended May 31, 1963, Texas Trinity had taxable income of $16,389.64. Its common stock account was $10,250 and its earned surplus was $11,077.58. The type of work performed by Texas Trinity consisted mostly of labor. This, in addition *85 to a weekly turnover in inventory which generated a large cash flow, allowed Texas Trinity to operate profitably and effectively on its capitalization as it then existed. Texas Trinity entered into a large "actuator" contract with the United States Air Force in about April 1963. It also entered into a large oil cooler cleaning contract with the Air Force in late July or August 1963. The oil cooler contract required that Texas Trinity secure larger plant facilities, new equipment, and to hire and train many new employees. Texas Trinity borrowed $55,000 from the Grand Prairie State Bank in 1963. The amount of $30,000 was borrowed on January 22, 1963, and the amount of $25,000 was borrowed in August 1963. These loans were secured by the personal collateral of petitioners. These loans were not repaid as of December 31, 1963. Anticipating that he would leave the employment of the LTV Corporation to become president of Texas Trinity, petitioner loaned Texas Trinity $4,800 on August 8, 1963. He received a promissory note payable on demand which did not bear interest. 1073 He became a full-time employee of Texas Trinity on September 1, 1963. After that date his principal source of *86 income was his salary as president of Texas Trinity. In September 1963 Texas Trinity repaid $2,800 of the $4,800 to petitioner. In October 1963, the Air Force began to reject most of the air coolers cleaned by Texas Trinity. They had to be recleaned at extra cost to the company. Texas Trinity also had some difficulty getting the Air Force to accept items under the actuator contract. On October 28, 1963, the petitioner loaned Texas Trinity an additional $25,000 which was also evidenced by a promissory note payable on demand which did not bear interest. Petitioner did not approach banks on behalf of the corporation to obtain additional operating funds because he did not want to jeopardize the short term credit position of Texas Trinity. He reasonably expected that the loans would be repaid within a relatively short period of time. The loans were made to provide additional operating capital on a short term basis and to protect his position and salary as president of Texas Trinity. As of December 31, 1963, Texas Trinity owed the petitioner $27,000. During late 1963 and early 1964 the petitioner attempted to secure further financing for Texas Trinity from friends, business associates, *87 banks, and various other companies. He used the Texas Trinity Balance Sheet as of December 31, 1963, in an attempt to obtain the financing. At the end of 1963 Texas Trinity was attempting to get change orders to their Air Force actuator and oil cooler contracts. At that time Texas Trinity believed it was due in excess of $50,000 on the contracts. As of December 31, 1963, Texas Trinity was a going concern and realizing income. It had considerable assets in the form of cash, prepaid expenses, accounts receivable, amounts due from or claims against the Government on the contracts, inventory of various types, equipment, and leasehold improvements. Its assets were in excess of its liabilities by approximately $109,040.30. In April 1964 Texas Trinity filed claims in excess of $100,000 with the Government on the oil cooler contract, but eventually recovered nothing. On May 12, 1964, petitioner entered into a contract with William A. Lynch wherein he turned over to Lynch all of his Texas Trinity stock and his rights to any claim against Texas Trinity in return for Lynch's agreement to take over the company and supply financing. Lynch did secure some financing for Texas Trinity. A lawsuit *88 by petitioner against Lynch on the contract was settled in late 1964 or 1965 by a zero judgment and offset of both parties' claims. For the fiscal year ended May 31, 1964, Texas Trinity reported a loss of $116,051.67 and the earned surplus account showed a deficit of $104,974.09. In their 1963 Federal income tax return the petitioners reported the following pertaining to Texas Trinity: (a) Salary
$ 7,050.00
(b) Expenses in connection with
salary from Texas Trinity
Mfg. & Supply, Inc., not re-2mbursed: Auto expenses -
business mileage 7,600 miles
at 10 cents per mile
$ 760.00
(c) Expenses in connection with
salary from Texas Trinity
Mfg. & Supply, Inc., not re-
imbursed:
Utilities
58.46
Telephone
13.17
Rent
140.00
Insurance
12.57
(d) Schedule D - Part I - Capital As-
sets, Short-term capital gains
and losses:
Non-business bad debt -
Texas Trinity Mfg. &
Supply Inc
($27,000.00)
Respondent, in his statutory notice of deficiency dated June 23, 1969, determined that petitioners had improperly claimed a $13,500 nonbusiness bad debt for 1963 with the following explanation: (a) It is determined that your money advances to Texas Trinity Manufacturing *89 & Supply Co., Inc., were in substance and effect equity capital investment which did not become worthless in 1963 and your claimed non-business bad debt loss of $27,000 is therefore disallowed. Alternatively, it is determined that your alleged loans to Texas Trinity Manufacturing & Supply Co., Inc., did not become worthless in 1963. Ultimate Findings 1. The amounts advanced by petitioner to Texas Trinity in 1963 were loans and not contributions to capital. 2. In making the loans to Texas Trinity in 1963 the petitioner was significantly motivated by a desire to protect his position and salary as its president. 1074 3. The loans made by petitioner to Texas Trinity were not worthless as of December 31, 1963. Opinion Petitioner contends that his unpaid advances of $2,000 and $25,000 to Texas Trinity constitute business bad debts which are deductible in full in 1963 under section 166(a)(1), Internal Revenue Code of 1954. To the contrary, respondent contests the characterization of the advances as loans, contending instead that they were capital contributions; and he argues, in the alternative, that if the advances were loans, they were not debts *90 which were worthless as of December 31, 1963. We are satisfied, on this record, that the advances were loans and we so hold. We are also satisfied that the loans constituted business, rather than nonbusiness, debts because the petitioner was "significantly motivated" in lending the money to Texas Trinity by his desire to protect his position and salary as its president. Since an appeal in this case would normally go to the Fifth Circuit, we will follow its decision in United States v. Generes 427 F. 2d 279 (C.A. 5, 1970), certiorari granted, even though we favor the "dominant and primary motivation" test. See Oddee Smith, 55 T.C. 260, 269-270 (1970), on appeal C.A. 5. However, based upon the record before us, we are unable to conclude that Texas Trinity's economic prospects as of December 31, 1963, were so moribund as to render worthless its obligations to the petitioner. It was a going concern with valuable assets at the end of 1963. It was still performing work on its contracts with the Air Force. It, in fact, filed large claims with the Air Force as late as April 1964. And the petitioners entered into a contract to dispose of their Texas Trinity stock *91 in May 1964. Consequently, we hold that petitioners have failed to prove that the debts became worthless in 1963, and thus are not entitled to any bad debt deduction in that year. Cf. Robert R. Riss, Sr., 56 T.C. 388, 405-410 (1971). Decision will be entered under Rule 50.