CLARENCE R. RITCHIE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ritchie v. Commissioner
Docket No. 35179-87
United States Tax Court
T.C. Memo 1989-426; 1989 Tax Ct. Memo LEXIS 424; 57 T.C.M. (CCH) 1282; T.C.M. (RIA) 89426; August 15, 1989; As corrected August 17, 1989 Wayne Toliver, for the petitioner. Abbey B. Garber, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1983 in the amount of $ 28,691.50 and an addition to tax under section 6651(a)(1) for that year in the amount of $ 3,172.87. [1] The issues for decision are: (1) whether petitioner is a "qualified individual," within the meaning of section 911(d)(1), and, therefore, entitled to the foreign earned income exclusion provided in section 911(a); and (2) whether petitioner is entitled under section 215 to a deduction for payment of alimony. [2]
*428 FINDINGS OF FACT Petitioner, who resided in Bakersfield, California at the time he filed his petition in this case, filed his 1983 Federal income tax return with the Internal Revenue Service Center at Philadelphia, Pennsylvania on September 24, 1984. Petitioner, a citizen of the United States, was employed by the Mobil Pipeline Company (Mobil) in Saudi Arabia during the year 1983. He began working for Mobil as an electrician in January 1978 on the condition that he would accept an overseas assignment if it was offered. Mobil paid employees who worked overseas a substantially higher salary than it paid its employees who worked in the United States. The higher pay was the principal reason petitioner agreed to accept an assignment in Saudi Arabia. After attending Mobil-sponsored schools in the United States, petitioner was transferred to Saudi Arabia in March 1980. Petitioner worked a total of 240 days inside Saudi Arabia during 1982. Petitioner worked a total of 230 days in Saudi Arabia during 1983. While working in Saudi Arabia, petitioner maintained a Saudi work visa and paid social insurance taxes to the Saudi government. Petitioner originally expected his work in Saudi *429 Arabia, in connection with Mobil's effort to build a pipeline across the Saudi desert, to continue for approximately two years. However, petitioner worked in Saudi Arabia until November 1983. Petitioner's original assignment in Saudi Arabia, which lasted approximately 18 months, was as an electrical inspector on pump station construction. Petitioner next worked for approximately six months on a commissioning team that traveled up and down the pipeline commissioning pump stations and bringing them on line. After commissioning was completed, petitioner was assigned to be an electrical supervisor for "division 3," which encompassed two pump stations, a pressure reduction station, and "maintenance center 10" (Center 10). Petitioner's living quarters were located at Center 10. During this last assignment, petitioner was paid by Mobil and technically was still an employee of Mobil. However, he was "on loan" and performed services for Petroline, a company which was wholly owned by the Saudi government. Petitioner's duties included teaching Petroline employees how to operate the pipeline. During this period, petitioner did not use Mobil's facilities. Instead, he utilized Petroline *430 transit quarters when in town, drove a Petroline vehicle, and received medical attention in Saudi hospitals rather than Mobil clinics. Approximately three hundred people were employed at Center 10. Out of this number, there were approximately 30 Americans employed by Mobil and approximately 30 British. The rest were "third-country nationals," including Pakistanis, Thais, Filipinos, and a large number of Saudis. Petitioner's accommodations were provided at no cost to him and were located in a newly constructed living quarters building at Center 10. Each living quarters building contained eight sleeping rooms with private baths and a central meeting room equipped with couches, a television, a refrigerator, a pool table and a popcorn machine. Petitioner ate his meals in a central mess hall. His meals at Center 10 were supplied free of charge. Petitioner generally mingled with all of his fellow employees, including the Saudis. However, petitioner learned very little of the Saudi language. During the last four months of his assignment in Saudi Arabia, petitioner was reassigned to "pump station 1" (Station 1) near the Persian Gulf. Approximately 40 people were employed at Station *431 1, eight of whom were American, eight British and the remainder third-country nationals. Because the risk of sabotage was considered great, approximately 50 Saudi National Guard Troops also were assigned to Station 1. Petitioner's duties at Station 1 consisted, in part, of training British technicians to do the work he was doing. During his stay in Saudi Arabia, petitioner followed a 42/21 work schedule. Under this schedule, petitioner worked for a 42-day period and then was allowed a 21-day rest period. Petitioner always left Saudi Arabia during his 21-day rest period and would lock his personal belongings in two large closets with padlocks which were provided for this purpose in the room he occupied. During his work periods, petitioner worked from 6:00 a.m. to 6:00 p.m. seven days a week. Petitioner at times played volleyball, basketball, or tennis with his fellow workers at the conclusion of his work day. Petitioner would sometimes drive around the countryside for pleasure. He was assigned a Petroline vehicle and possessed a Saudi driver's license (as well as an international driver's license) which he used for business and personal trips. Petitioner would occasionally *432 have to visit some of the larger cities in Saudi Arabia, such as Jeddah, Dhahran, and Riyadh, on business. Other cities, such as Mecca, were off-limits to non-Moslems. Although Dhahran and Riyadh were within driving distance of petitioner's work place, they were sufficiently distant that for a one day trip he would have to leave at daybreak and would not get back until after dark. Petitioner could more easily drive on his business trips to visit some of the smaller villages which were closer in proximity to petitioner's location. He occasionally visited towns which were mostly inhabited by Bedouins who lived in tents. Petitioner would sometimes eat goat and rice with the Bedouins and drink shrub tea. On one occasion, petitioner assisted a Bedouin who had run out of gas in the desert and was later invited to supper in the man's tent. Petitioner also occasionally visited some villages to shop. Petitioner would sometimes visit his American and English friends in the larger cities and on one occasion at the beginning of his 21-day rest period spent a week in Dhahran. At the time of his transfer to Saudi Arabia in 1980, petitioner was married to Ms. Judith Ritchie. Petitioner *433 and Ms. Ritchie resided in a house which petitioner had rented in Great Bend, Kansas. The rental agreement named petitioner as lessee. Petitioner left his personal possessions at the rented house. In 1983 petitioner maintained a State of Kansas driver's license which he allowed to expire. Petitioner was not registered to and did not vote in the United States in 1981, 1982, and 1983. Petitioner owned two undeveloped parcels of land in the United States, one in Kansas and one in Oklahoma. Petitioner owned several older-model automobiles which he had restored and which were registered in the United States. Petitioner and Ms. Ritchie also owned two later model cars which were registered and located in the United States. Petitioner and Ms. Ritchie have two children, a son and a daughter. At the time petitioner began his overseas work, the son lived with petitioner and Ms. Ritchie in the rented house. However, while petitioner was in Saudi Arabia, the son moved to Hays, Kansas to attend college. Petitioner paid for his son's education and put a down payment on a mobile home for his son to live in while at college. At the time petitioner began his overseas work, the daughter was *434 married and was living in a separate house in Great Bend with her husband and children. At the end of each work period in Saudi Arabia, Mobil would either provide petitioner with a round-trip business class airline ticket to Great Bend, Kansas or petitioner could elect to take the value of the ticket in cash and spend the money in whatever manner he chose. Petitioner always took the cash and purchased his own airline tickets. Although petitioner and Ms. Ritchie had been experiencing marital difficulties for approximately 15 years, whenever he returned to the United States prior to sometime early in 1982, petitioner stayed with his wife in the rented house in Great Bend. During 1982, petitioner returned to the United States during each rest period, although at times he would stop in Athens or some other city on the way to the United States. However, beginning in early 1982, petitioner no longer returned to Great Bend immediately when he was in the United States. Instead, he would sometimes spend a few days in New York. Sometimes, petitioner would stop in Winfield, Kansas to visit his parents whom he helped support. He sometimes stopped in Casablanca on his way back to Saudi *435 Arabia. He did, however, come back to Great Bend during each trip to the United States to make sure that all of the bills had been paid and to take care of any other personal matters which required attention. Beginning in 1982, when petitioner was in Great Bend, he either stayed at a motel or at his daughter's home. Petitioner left any personal belongings, such as tools, he had in the United States at his daughter's home. Petitioner divorced his wife in 1983. The divorce decree, dated April 1, 1983, was issued by the District Court of Barton County, Kansas. In addition to the personal effects he owned, petitioner received, subject to any indebtedness thereon, the title to several older automobiles and a late-model Ford van. Petitioner also received, subject to any indebtedness thereon, title to the two parcels of undeveloped land with the understanding that the proceeds from the sale, if any, of one parcel would be given to his son. Petitioner assumed all other debts of the parties and agreed to maintain two life insurance policies which named Ms. Ritchie as beneficiary. Ms. Ritchie received her personal effects, one older-model automobile and all of the couple's household *436 furniture and appliances. Under the terms of the divorce decree, petitioner was obligated to pay Ms. Ritchie $ 1,500 per month for a period of 36 months or until petitioner discontinued his employment in Saudi Arabia, whichever occurred first. In the event that petitioner did discontinue his employment in Saudi Arabia but was able to obtain employment on an offshore rig in the United States, he would be obligated to pay Ms. Ritchie $ 1,000 per month for the remainder of the 36-month period. However, if he could not secure a job on an offshore rig in the United States and was forced to accept a regular electrician's job (the pay for which was considerably lower than for work on a foreign or offshore assignment), petitioner would be obligated to pay Ms. Ritchie $ 750 per month for a period not to exceed 121 months. Prior to his transfer to Saudi Arabia, petitioner and Ms. Ritchie had opened a joint checking account with American State Bank & Trust Company in Great Bend (American). Petitioner deposited his paycheck in this account and this money was used to take care of Ms. Ritchie and their son. In February 1980, just prior to going to Saudi Arabia, petitioner opened a separate *437 checking and savings account at American. After petitioner left for Saudi Arabia, only Ms. Ritchie used the joint checking account even though petitioner's name was never removed from the joint account and he, therefore, had access to the funds in that account. Petitioner transferred $ 1,500 to the joint account each month. After petitioner's divorce on April 1, 1983, he continued to deposit $ 1,500 per month in the joint account in payment of his obligation under the divorce decree. Petitioner also opened another checking account at a bank in Kansas City. Petitioner never opened a bank account in Saudi Arabia. By the end of October 1983, petitioner had deposited a total of $ 10,500 in the joint account at American which still bore his name. Petitioner's 1983 Federal income tax return was prepared by Mr. James C. Reynolds, an accountant. On his 1983 return, petitioner claimed a deduction of the $ 10,500 he had deposited in the joint account as alimony under section 215. In addition, he deducted, as alimony, an additional $ 1,500 he claimed to have paid his wife by check in November 1983 and $ 750 he claimed to have paid into the District Court of Barton County, Kansas as *438 alimony for December 1983. In computing his 1983 gross income, petitioner excluded, as "foreign earned income," a portion of the wages he received from Mobil in 1983. Petitioner provided Mr. Reynolds with a copy of his work schedule and rotation calendar. Mr. Reynolds prepared the computation of petitioner's foreign earned income exclusion from this calendar. Petitioner signed the return without examining closely the dates used to compute the foreign earned income exclusion. According to his 1983 return, petitioner returned to the United States during each 21-day rest period, in accordance with the following schedule: Arrived in U.S.
Departed from U.S.
Number of Days in U.S.
01/13/83
02/06/83
25
03/20/83
04/09/83
21
05/22/83
06/11/83
21
07/12/83
08/01/83
21
09/13/83
10/03/83
21
11/25/83
12/31/83
37
146
Petitioner's return was in error in reporting that all his rest periods in 1983 were spent in the United States. Petitioner did leave Saudi Arabia during each rest period in 1983 and, except for an occasional short visit to one of the larger cities at the beginning or end of the rest period, spent the 21-day rest period *439 outside Saudi Arabia. After his divorce in 1983, petitioner would use the cash he could take in lieu of round-trip air fare to the United States to spend increasing amounts of his 21-day rest period outside the United States. He went to Europe and spent time in England, Italy, and Greece. Petitioner spent all of one 21-day rest period touring Europe on a Eurorail pass and did not come to the United States at all during that rest period. In 1983, petitioner spent approximately one-half of his total leave time in the United States and the other half in Europe or other foreign areas away from his work location. When petitioner did return to the United States in 1983, he no longer flew into Great Bend. Instead, he flew into Kansas City, Kansas. Petitioner would sometimes visit a girl friend who lived in Kansas City and then visit his parents in Winfield or his son in Hays. Sometimes he would visit his daughter and grandchildren in Great Bend. Petitioner would then fly out of Kansas City on his way back to Saudi Arabia. Petitioner's employment in Saudi Arabia terminated on November 1, 1983. Petitioner returned to the United States with approximately six boxes which contained *440 all of his personal effects. The boxes weighed 200 to 300 pounds each. Petitioner would have continued to work in Saudi Arabia if Mobil had offered him another position there. After his departure in November 1983, petitioner never returned to Saudi Arabia. Upon his arrival in the United States, Mobil transferred petitioner to California. Petitioner did not obtain an assignment on an offshore drilling rig. Respondent issued the notice of deficiency in this case on July 30, 1987. In his notice of deficiency, respondent determined that petitioner was not entitled to exclude any portion of his 1983 wages from gross income under section 911. Respondent also determined that petitioner was not entitled to deduct any of the $ 12,750 petitioner claimed to have paid as alimony in 1983. OPINION The first issue for decision is whether petitioner may exclude from gross income under section 911(a) a portion of his 1983 wages as "foreign earned income." Section 911(a) provides, in part that, "At the election of a qualified individual * * *, there shall be excluded from the gross income of *441 such individual and exempt from taxation under this subtitle, for any taxable year * * * the foreign earned income of such individual * * *." (Emphasis supplied.) Section 911(b)(1) defines the term "foreign earned income" as amounts received by an individual from sources within a foreign country which constitute earned income attributable to services performed by such individual "during the period described in subparagraph (A) or (B) of subsection (d)(1), whichever is applicable." Section 911(d)(1) provides that: (1) QUALIFIED INDIVIDUAL. -- The term "qualified individual" means an individual whose tax home is in a foreign country and who is -- (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period. Petitioner has not argued *442 that he was physically present in Saudi Arabia for 330 full days during a consecutive 12-month period and it is obvious from the facts we have found that he was not. Thus, in order for petitioner to be considered a qualified individual entitled to the exclusion provided by section 911(a), he must prove both that his tax home was within Saudi Arabia during the year at issue and that he was a bona fide resident of Saudi Arabia for an uninterrupted period which includes an entire taxable year. Section 911(d)(3) provides that, for purposes of section 911, a taxpayer's "tax home" is his home for purposes of section 162(a)(2) (relating to traveling expenses while away from home). For purposes of section 162(a)(2), a taxpayer's tax home is generally located at his regular or principal place of employment. Michel v. Commissioner, 629 F.2d 1071 (5th Cir. 1980), affg. a Memorandum Opinion of this Court; section 1.911-2(b), Income Tax Regs. However, regardless of where a taxpayer's home is for purposes of section 162(a)(2), "An individual shall not be *443 treated as having a tax home in a foreign country for any period for which his abode is within the United States." Section 911(d)(3); section 1.911-2(b), Income Tax Regs. Therefore, even though, under the facts present here, it is obvious that petitioner's regular or principal place of business was located in Saudi Arabia during 1983, he will not be treated as having a "tax home" there for purposes of section 911(a) if his "abode" was in the United States during that year. Therefore, for purposes of section 911(d)(3), it is necessary to determine the location of the taxpayer's "abode." In Bujol v. Commissioner, T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988), we concluded, based on the facts there present, that the taxpayer's abode was in the United States during the year at issue and, therefore, his tax home was not in a foreign country. We made the following observations concerning the term "abode" as it was used in section 911(d)(3): "Abode" has been variously defined as one's home, habitation, *444 residence, domicile, or place of dwelling. Black's Law Dictionary 7 (5th ed. 1979). While an exact definition of "abode" depends upon the context in which the word is used, it clearly does not mean one's principal place of business. Thus, "abode" has a domestic rather than vocational meaning, and stands in contrast to "tax home" as defined for purposes of section 162(a)(2). [Fn. ref. omitted.] Bujol v. Commissioner, T.C. Memo. 1987-230, 53 T.C.M. 762, 763-764, 56 P-H Memo T.C. par. 87,230 at 1112-87. In order to determine where a taxpayer's abode is located, it is necessary to examine and compare the taxpayer's ties, if any, to the foreign country in question with his domestic ties (i.e., his familial, economic, and personal ties), if any, to the United States. Temporary presence in the United States does not necessarily mean that the taxpayer's abode is in the United States during such presence. Section 1.911-2(b), Income Tax Regs. Furthermore, the taxpayer's maintenance of a dwelling in the United States, whether or not the dwelling *445 is used by his spouse and dependents, does not necessarily mean that his abode is in the United States. Section 1.911-2(b), Income Tax Regs.
In Lemay v. Commissioner, 837 F.2d 681 (5th Cir. 1988), affg. a Memorandum Opinion of this Court, the taxpayer, who had resided in Louisiana prior to being transferred overseas, worked on an offshore rig in the territorial waters of Tunisia. Although the taxpayer spent most of his work period on the offshore rig, he was occasionally required, because of his supervisory position, to travel to his employer's main offices on the Tunisian mainland. While on the mainland, the taxpayer stayed in a hotel room or apartment provided by his employer. The taxpayer did have some contact with Tunisian residents. He met Tunisian municipal officials and occasionally attended informal gatherings or sporting events. Despite these contacts with the Tunisian mainland, the Fifth Circuit upheld our conclusion that, because the taxpayer had retained strong economic, familial, and personal ties to his residence in Louisiana, his abode remained within the United States during the year at issue. Lemay v. Commissioner, supra at 684. *446 The Fifth Circuit noted that: While the regulations do provide that the maintenance of a dwelling in the United States does not necessarily mean that an individual's abode is in the United States, Lemay did more than merely maintain his dwelling in Lake Charles, Louisiana. Lemay spent approximately half of his time with his family in Louisiana. He voted in Louisiana, maintained a bank account in Louisiana, and possessed a Louisiana driver's license. The combination of these factors, when contrasted with Lemay's transitory contacts with Tunisia, support the conclusion that Lemay's "abode" remained in Louisiana in 1982. * * * Under the facts we have found and the criteria set forth in Lemay v. Commissioner, supra and numerous cases of this Court, we consider it clear that from April 1, 1983, until he returned to the United States shortly after November 1, 1983, petitioner did not maintain an abode in the United States. The house he and his wife had shared became hers after the divorce until she shortly thereafter gave it up and moved. Petitioner had no direct connections with any specific place in the United States after the divorce. It is not as clear *447 whether he maintained an abode in the United States for the first three months of 1983. During this time he was maintaining a home for his wife and going back to Great Bend to see that bills were paid and to take care of other business matters. It is not completely clear whether some of his effects were still in the house. In any event, we do not need to decide this question since we conclude as hereinafter discussed that petitioner was not a bona fide resident of Saudi Arabia for the full taxable year 1983 or the full taxable year 1982. In order to be considered a "qualified individual" entitled to exclude a portion of his wages as "foreign earned income," petitioner must also show that he was a bona fide resident of a foreign country for an uninterrupted period which includes an entire taxable year. This is a different question from the question of abode, and although it involves to some extent the same facts as those relative to determining abode, it requires a different factual determination. *448 The "tax home" inquiry must, in light of section 911(d)(3), focus on the taxpayer's ties to the United States in order to determine "abode." In contrast, the "bona fide residence" inquiry focuses, in essence, on the taxpayer's ties to the country of which he claims to be a resident. Furthermore, the taxpayer must present "strong proof" that he was a bona fide resident of a foreign country, whereas he need only establish that his tax home was in a foreign country by a preponderance of evidence. Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980). Therefore, a conclusion that petitioner's tax home was not within the United States at any time during 1983 for purposes of section 911 is, in no way, determinative of whether petitioner was a bona fide resident of Saudi Arabia. The statute requires petitioner to establish that he was a bona fide resident of a foreign country for "an uninterrupted period which includes an entire taxable year." Section 911(d)(1)(A). Since petitioner computes his income on the basis of the 12-month period ending on December 31, his annual accounting period, his "taxable year" is the calendar year. Section 441(d); section 441(c); section *449 441(b)(1); section 7701(a)(23). Although petitioner was stationed in Saudi Arabia for his entire 1982 taxable year, he left Saudi Arabia in November 1983, prior to the end of his 1983 taxable year. This fact alone prohibits petitioner from being considered a bona fide resident for the entire taxable year 1983. Apparently petitioner's position is that he is entitled to exclude a portion of his wages for the period January 1983 through November 1983 since he was a bona fide resident of Saudi Arabia during the entire taxable year 1982. Since petitioner is claiming the exclusion for 1983, he also apparently recognizes that he must have continued to be a bona fide resident of Saudi Arabia for the period January 1 through November 1, 1983. On this basis, petitioner must establish by strong proof that he was a bona fide resident of Saudi Arabia for an uninterrupted period which includes his entire 1982 taxable year and extends to November 1, 1983. Estate of Roodner v. Commissioner, 64 T.C. 680 (1975); Dawson v. Commissioner, 59 T.C. 264 (1972). The determination *450 of whether a taxpayer is a bona fide resident of a foreign country requires an examination of all relevant facts and attendant circumstances of each particular case in light of the appropriate legal standard, "bona fide residency." To the extent feasible, the principles of section 871 and the regulations thereunder (relating to what constitutes residence in the United States in the case of an alien individual) should be applied. Schoneberger v. Commissioner, supra at 1023; section 1.911-2(c). However, the use of the words "bona fide" prior to the word "residency" indicates that Congress had in mind something more than mere residency. The factors to be considered in determining whether a taxpayer is a bona fide resident of a foreign country as set forth in Sochurek v. Commissioner, 300 F.2d 34 (7th Cir. 1962), revg. 31 T.C. 131 (1961), were accepted in Dawson v. Commissioner, supra at 268. These factors are: (1) intention of the taxpayer; (2) establishment of a home temporarily in the foreign country for an indefinite *451 period; (3) assimilation into the foreign environment and culture; (4) physical presence in the foreign country consistent with employment; (5) nature, extent, and reasons for temporary absences from temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded income tax status by employer; (9) marital status and residence of family; (10) nature and duration of employment (i.e., whether assignment abroad could be promptly accomplished within a definite or specified time); and (11) good faith in making the trip abroad (i.e., whether for purpose of tax evasion). Schoneberger v. Commissioner, supra at 1023; Dawson v. Commissioner, 59 T.C. 264, 268 n.4 (1972). Petitioner testified that he began to consider himself a resident of Saudi Arabia in late 1981 or early 1982 when upon returning to Great Bend, Kansas, he ceased staying in the home he leased for himself and his family. It therefore appears from petitioner's testimony that he has not shown that his intent was to be a bona fide resident of Saudi Arabia during *452 the entire year 1982. Petitioner had no home in Saudi Arabia other than the quarters furnished by his employer when he was on his work rotation. Petitioner had little connection with the Saudi environment and culture. His contacts were primarily with his fellow workers in the quarters the employers furnished and to a limited extent with other American and British friends who were also working in Saudi Arabia. Any contact with Saudis other than those with whom he worked was minimal. Petitioner, with a minor exception, was present in Saudi Arabia only for his work periods, leaving for all his rest periods. The one time definitely shown in the record when petitioner spent a portion of his rest period in Saudi Arabia, was one week at the beginning of a rest period that he spent in Dhahran with American friends. His absences during his rest periods was his own choice of where he preferred to spend his time. He was not required to leave Saudi Arabia during his rest periods. Petitioner paid no income tax to Saudi Arabia but did pay a special insurance tax. His employer withheld United States income tax from his wages. Petitioner initially expected to work in Saudi Arabia for *453 a period estimated to be less than two years, but during 1982 and 1983 the length of his work became indefinite. Petitioner accepted the position in Saudi Arabia for the higher pay and not for income tax evasion purposes. Consideration of these criteria indicate that petitioner was not a bona fide resident of Saudi Arabia during the entire year 1982. In Hertig v. Commissioner, 19 T.C. 109 (1952), the taxpayer wanted to work overseas and consequently accepted an assignment in Afghanistan. He did not return to the United States for three years. His employer furnished his food and lodging at no cost. At first, the taxpayer lived in a barracks which was located in the desert. He later was moved to a two-man living quarters at his employer's headquarters in Kandahar, Afghanistan. He, along with his roommate, attempted to make these quarters livable by buying curtains, furniture, cooking utensils, and appliances. The taxpayer learned to speak and acquired a working knowledge of the Persian language. The taxpayer participated in what little social activities were available in Afghanistan and vacationed in Pakistan during his rest periods. Despite the presence *454 of these facts, we held that the taxpayer was not a bona fide resident of Afghanistan. We noted that the taxpayer had no desire or intention to establish a residence in Afghanistan. He simply desired to spend his working life abroad and Afghanistan happened to be available. When his assignment was over his endeavor was to find another job abroad and not necessarily to stay in Afghanistan. He did not pay any taxes to the Afghanistan government. We further noted that, according to the legislative history of the bona fide residency provision, the exclusion should be available only to nonresident American citizens who establish, maintain, and take on the obligations of a home in a foreign country. It should not be available to technicians or American citizens who are merely temporarily away from home. Hertig v. Commissioner, supra at 114. We then stated that: We have made our finding because within that explicit legislative purpose we view petitioner as being no more than a "transient or sojourner" for a specific purpose and definite period in Afghanistan, without a home there or its "obligations," living in the company barracks, eating at the company mess, *455 and who, on this record, was a "technician" merely temporarily away from home. * * * Under our holding in Hertig v. Commissioner , supra, the facts here lead to the conclusion that petitioner was not a bona fide resident of Saudi Arabia. Petitioner originally agreed to take an overseas position, he did not choose to go to Saudi Arabia. He went wherever Mobil chose to assign him. Thus, it appears that petitioner merely formed an intention of going overseas rather than an intention to reside in any specific country. During construction of the pipeline, petitioner lived in temporary camps with hundreds of other men. He moved frequently in accordance with the demands of his job. There was no way to determine exactly how long construction would take. However, Mobil had speculated that construction of the pipeline and, therefore, petitioner's employment in Saudi Arabia, would last from eighteen months to two years. When construction was completed, he moved into a more permanent dormitory-like building where he had his own room in which to sleep. However, he still shared a common area with several other men and ate his meals in a centralized mess hall with *456 his fellow workers. Thus, petitioner did not establish any sort of "home," in the traditional sense, when he moved to Saudi Arabia, nor did he do so in 1982 or 1983. The instant case is clearly distinguishable from Schoneberger v. Commissioner, supra, where we held that the taxpayer, an American citizen, had established that he was a bona fide resident of France for at least a portion of the years there at issue. In Schoneberger v. Commissioner, supra, the taxpayer was an airline pilot who flew international flights out of New York for a major airline. The facts of that case showed that the taxpayer had formed an intention to stay in France for an extended, yet indefinite, period. Furthermore, whenever the taxpayer had enough time between flights, he would return to France rather than stay in the United States. He rented an apartment in Paris and purchased furniture for the apartment. In addition, the taxpayer had made efforts to assimilate himself into the French environment. He studied the French language. He had French as well as American friends. He dated a French woman and participated in social activities with her family. *457 In contrast, the camps and installations to which petitioner was assigned were, for the most part, insulated from everyday Saudi life. In each of the areas to which petitioner was assigned, the nearest village was located approximately 50 miles away. Any Saudi cities of consequence were even further away. Although petitioner testified that he did occasionally visit some villages to eat and socialize with the Bedouins, it is clear from his testimony that these outings were rare and he did not enjoy them. He learned very little, if any, of the Saudi language. Furthermore, during petitioner's 42-day work periods, he worked a rigorous schedule. He left Saudi Arabia during his rest periods when he did have free time. Petitioner had very little opportunity during his work period for any significant participation in the Saudi community on either a social or cultural level and did not choose to spend his free time in Saudi Arabia. In other words, he did not assimilate himself into the Saudi environment. In 1982, he always returned during his rest periods to the United States where his wife (to whom he was married until April of 1983), daughter, son, and parents lived. He also had *458 a girl friend in Kansas City. In 1983, he spent a substantial amount of time during his rest periods in Europe. In contrast, the longest nonworking period he ever spent in Saudi Arabia during 1982 and 1983 was a one-week vacation in Dhahran. It is apparent, therefore, that petitioner left Saudi Arabia at every opportunity and, for the most part, only came back when necessary to begin his work rotation. For the reasons set forth above we also conclude that the instant case is distinguishable from Swenson v. Thomas, 164 F.2d 783 (5th Cir. 1947), where the Fifth Circuit, in holding that the taxpayer was a bona fide resident of Columbia, stressed the fact that he lived in Columbia over three years without returning to the United States. The court also pointed out that the taxpayer had paid income taxes to the Columbian government while stationed there. As was the case in Hertig v. Commissioner, supra, petitioner in the instant case did not pay income taxes to a foreign country. He did pay social insurance tax to the Saudi government but we have been given no indication as to the amount paid, whether nominal or great. On this record, we conclude *459 that petitioner has not shown that he took on the obligations of living in Saudi Arabia. After examining the facts and circumstances of the instant case, we conclude that petitioner has not shown by strong proof that he was a bona fide resident of Saudi Arabia during all of 1982 and the first ten months of 1983. Therefore, he is not entitled to exclude any portion of his 1983 wages from gross income under section 911(a). The next issue for decision is whether petitioner is entitled to deduct alimony payments he claims to have made to Ms. Ritchie in 1983 pursuant to the divorce decree dated April 1, 1983. Respondent agrees that the divorce decree required petitioner to make payments of alimony to Ms. Ritchie. Respondent's contention is that petitioner has failed to show that the payments were actually made. Petitioner testified that he transferred $ 1,500 per month from his separate bank accounts into Ms. Ritchie's checking account at American from which account his name had not been removed, during the period April 1983 through October 1983, in discharge of his obligations under the divorce decree. Petitioner testified that he drew no checks on this account but merely failed *460 to remove his name from the account. Ms. Ritchie withdrew the funds put into the American account. Petitioner introduced into evidence monthly statements from the American account covering the period December 20, 1982 through December 19, 1983 to substantiate his claims that he deposited alimony payments in the account. Petitioner further testified at trial that he paid Ms. Ritchie $ 1,500 as alimony in November 1983 and that he paid $ 750 into the District Court of Barton County in December 1983 in discharge of his alimony obligations under the divorce decree. Petitioner introduced no evidence, other than his own testimony, to substantiate his claims that he paid alimony in November 1983 or December 1983. Section 215 allows a taxpayer to deduct "alimony or separate maintenance payments" paid by him during the taxable year. Section 215(a). Section 215(b), in turn, defines the term, "alimony or separate maintenance payments," as alimony or separate maintenance payments (as defined in section 71(b)) which are includable in the gross income of the recipient under section 71. Respondent *461 argues that petitioner is not entitled to deduct any amounts under section 215 because petitioner has failed to substantiate his claims that he, in fact, made any alimony payments in 1983. Respondent points out that petitioner failed to produce cancelled checks or bank records showing the transfers from his separate accounts to the American account. Respondent further argues that the bank statements introduced do nothing more than show that some deposits were made in the American account. They do not show the source or purpose of these deposits. Petitioner did not introduce the testimony of Ms. Ritchie, the purported recipient of the funds. Furthermore, petitioner introduced no evidence, such as cancelled checks or receipts, to support his claim that he paid $ 1,500 to Ms. Ritchie in November 1983 and paid $ 750 to the District Court of Barton County in December 1983. According to respondent, the only evidence that any alimony payments were actually made in 1983 is petitioner's uncorroborated testimony which respondent argues we should disregard as self-serving. This Court, as trier *462 of fact, may discount testimony which it finds to be self-serving or unworthy of belief. United States v. Generes, 427 F.2d 279, 283-284 (5th Cir. 1970); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). However, such is not the case here. We found petitioner's testimony to be completely credible. The bank statements introduced into evidence support his testimony that he transferred $ 1,500 per month to the American account in payment of his obligations under the divorce decree. They show deposits of $ 1,500 to the American account in 1983 on April 28, May 26, June 27, July 28, August 30, September 29, and October 27. We do not consider it a coincidence that these deposits exactly equal petitioner's monthly obligations under the April 1, 1983 divorce decree. Furthermore, respondent has not introduced any evidence to rebut petitioner's testimony that he complied with the decree (i.e., court action in response to nonpayment). We also find credible petitioner's uncontradicted testimony that he paid $ 1,500 directly to Ms. Ritchie in November 1983 and paid $ 750 into the District Court of Barton County in December 1983. Respondent contends, however, *463 that petitioner should not be able to deduct the amounts he transferred to the joint checking account in April, May, June, July, August, September, and October of 1983 because the account continued to be held jointly and, therefore, petitioner could have withdrawn the amounts he transferred to the account at any time. As noted, section 215(a) allows the deduction of only those amounts "paid" during the taxpayer's taxable year. Although respondent does not phrase his contention as a timing argument, he appears to be suggesting that petitioner never truly "paid" alimony or separate maintenance payments in 1983 since he merely transferred funds to an account over which he retained control. We need not address this contention because the monthly statements which were introduced into evidence show that the American account was closed out sometime in December 1983. The last deposit of $ 1,500 occurred on October 27, 1983 and the last withdrawal (excluding service fees) occurred on October 28, 1983. Thus, all of the funds transferred to the account by petitioner in 1983 were withdrawn by the end of the 1983 taxable year. The only real question, therefore, is whether these amounts were *464 withdrawn by petitioner or by Ms. Ritchie as alimony. The answer to this question turns, once again, on our assessment of petitioner's veracity. As stated previously, we find petitioner's testimony to be credible. He testified that, prior to the divorce, he had been placing $ 1,500 in the American account each month to cover Ms. Ritchie's living expenses. The divorce decree required petitioner to pay Ms. Ritchie $ 1,500 a month as long as he was employed in Saudi Arabia. Petitioner further testified that he did not write checks on the American account or withdraw funds from it after he was transferred to Saudi Arabia in 1980. Thus, if we believe petitioner's testimony, which we do, the only other person with signature authority over the account, namely Ms. Ritchie, must have withdrawn funds. Therefore, the petitioner "paid" alimony or separate maintenance payments in the amounts deposited into the American account and the $ 750 paid to the District Court of Barton County during the 1983 taxable year and is entitled to deduct such amounts from his 1983 income. Respondent's final contention is that petitioner's deduction for alimony for the month of November 1983 should be limited *465 to $ 750 even though petitioner paid Ms. Ritchie $ 1,500 in the month of November. Respondent points out that Paragraph 9 of the April 1, 1983 divorce decree specifically provides that: At the conclusion of the petitioner's employment in Saudi Arabia * * * and in the event the petitioner cannot secure off-shore drilling work in the U.S.A., said maintenance shall be reduced to the sum of $ 750.00 per month * * *. Respondent further notes that, according to petitioner's own testimony, his employment in Saudi Arabia terminated on November 1, 1983 when "our contract was up." Moreover, petitioner did not secure, nor has he ever secured, offshore drilling work in the United States. Respondent argues that, in light of the above provision, any payment by petitioner in November 1983 in excess of $ 750 is not a payment under a divorce decree in accordance with section 71(b)(1)(A) and, therefore, such excess is not deductible under section 215. We agree with respondent. It is axiomatic that, in order for payments to a spouse to be deductible under section 215(a), they must meet the definitional *466 requirements of section 71(b) and be includible in the gross income of the recipient. Section 215(b). One such definitional requirement under section 71(b) is that the payments be received under a divorce or separation instrument (i.e., a divorce decree). Section 71(b)(1)(A). Petitioner's employment in Saudi Arabia was concluded on November 1, 1983. Petitioner did not obtain employment on an offshore rig in the United States during November. Thus, under the unambiguous provisions of the divorce decree, he was obligated to pay Ms. Ritchie $ 750 as alimony in November 1983 rather than $ 1,500. Because the amount of petitioner's payment which was in excess of $ 750 was not required under the divorce decree, it does not meet the requirements of section 71(b) and petitioner may not deduct this excess under section 215. Gordon v. Commissioner, 70 T.C. 525, 529 (1978). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The addition to tax under section 6651(a)(1)↩ and additional interest income determined by respondent in the notice of deficiency were not placed in issue by the pleadings.